FREDERICK T. HYNE v. NATHANIEL TOMPKINS OSBORN AND JAMES OSBORN.

*Deed—Execution and delivery of convey's title to grantee—Which is not divested by redelivery to the grantor to enable him to secure his wife's signature to the instrument—Which she refuses to sign and destroys—Execution, by an heir, of an instrument admitting the receipt by her of payment for her interest in the estate—For which she "signs off" all her right, title, claim, or demand thereto—Under which purchaser takes possession of land, and holds for years without adverse claim from her or her heirs—Vests an equitable right in the purchaser to her interest in said land—Entitling him to a decree quieting his title as against her heirs—If he sees fit to file a bill for that purpose.*

1. Where a grantor executed and delivered a deed of land, and the grantee redelivered it to him to secure the signature of his wife thereto, who refused to sign the same and destroyed the deed,—

 *Held,* that the *title* passed by formal conveyance and delivery, and was not impaired or lessened by the subsequent destruction of the deed. *Warren v. Tobey,* 32 Mich. 45.

2. Where one of the heirs of a deceased land-owner executed a paper writing with *one* witness, in which she admitted payment, "to her full satisfaction, of all her right, title, claim, or demand, in whatever manner or shape, for which she signed off all right, title, claim,

or demand of the estate of said deceased," and the vendee went into and continued in *peaceable* possession for many years, she nor her heirs making no claim to the land,—

*Held*, that, while the instrument lacked the legal formalities of a good deed, it was sufficient to give the purchaser an *equitable* right to the vendor's interest in the land, and could be considered as a *written* contract of sale, *performed* on the part of the purchaser, entitling him to a decree quieting his title as against his vendor's heirs, if he saw fit to file a bill for that purpose.

Appeal from Livingston. (Newton, J.) Argued June 17, 1886. Decided July 1, 1886.

Bill for partition. Complainant appeals. Bill dismissed. The facts are stated in the opinion and head-notes.

*Benj. T. O. Clark, L. S. Montague,* and *D. Shields,* for complainant.

*F. M. Osborn,* for defendant Nathaniel T. Osborn.

MORSE, J. Complainant files his bill to obtain partition of certain premises. It was dismissed in the court below.

One Isachar Osborn died in the township of Brighton, November 5, 1844.

At the time of his death he was seized in fee simple of the S. W. ¼ of the N. E. ¼, and the S. E. ¼ of the N. W. ¼, of section 8, township 2 N., of range 6 E., in said township of Brighton and county of Livingston.

He left a will, which was duly admitted to probate. By its provisions he bequeathed all his property, including this 80 acres of land, it being the only real estate he owned, to his widow, Arminda Osborn, during the term of her natural life, or so long as she should remain unmarried, limiting her power over the property to her support during widowhood. At the death or marriage of the said Arminda the property was to be equally divided between his children, to wit, Nathaniel Tompkins, Bethel, John, Lovina, and Arminda, all of whom were living at the time of his death. The widow did not remarry, and died December 24, 1850.

John Osborn died about 1868, leaving as his heirs Reuben

M., James, Mary, and Clara Osborn, and Luana Smith. Mary intermarried with one Haynes, and Clara with one Leffingwell.

Lovina Osborn intermarried with one Van Leuven, and died in 1856, leaving surviving her, as her heirs at law, Eliza Ann Van Leuven, Julia Ann Johnson, and Cassander Van Leuven. Eliza Ann married one Arms.

Arminda Osborn, daughter of Isachar, married one Silas Wood, and died in Brighton in 1869, leaving the following heirs: Alfred S. Wood, William Wood, Charles Wood,. Cornelius Wood, and Eliza Craig.

The complainant claims that he acquired the interest of said John Osborn in said premises, to wit, the undivided one-fifth part thereof, by a quitclaim deed from his five heirs, heretofore named, dated April 17, 1884.

He also avers that he purchased the share of said Lovina: Osborn, and his title to the same is evidenced by three quit-claim deeds: One from Eliza Ann Arms, dated February 12, 1884; one from Julia Ann Johnson, of date February 8,. 1884; and one from Cassander Van Leuven and wife, dated February 8, 1884.

He further alleges that he bought one-fifth part of the share of said Arminda Osborn, and took a quitclaim deed of the same, from Alfred S. Wood, her son, February 23, 1884.

This secured to him, as he claims, eleven twenty-fifths of the premises; and he admits and charges in his bill that defendant Nathaniel Tompkins Osborn is the owner of the remaining fourteen twenty-fifths by descent and purchase,. as follows: His own share, one-fifth; the share of Bethel, one-fifth; and four-fifths of his sister Arminda's share, being four twenty-fifths of the whole land, acquired from her heirs, William, Cornelius, and Charles Wood, and Eliza Craig.

The defendant James Osborn, son of John Osborn, was a: minor when he deeded to complainant, such deed being exe-cuted by Lewis Smith, his guardian. He is made a defend-ant, as complainant avers, to determine the validity of his. deed.

The defendant Nathaniel Tompkins Osborn denies the

right and title of complainant to any share or interest in said premises, and claims to own the whole of the same himself.

He alleges that he purchased John's share before 1850, and also about the same time he bought the interest of Bethel, Lovina, and Arminda; that ever since the twenty-fourth day of December, 1850, he has owned the whole of said premises in fee simple, and had open, notorious, and adverse possession of said land against everybody, and has paid all the taxes assessed against the said premises from that date to the present time.

It appears from the proofs that from the time of his father, decease up to the date of his mother's death, the defendant Nathaniel Tompkins Osborn lived upon the premises, and took care of his mother. He paid the debts of his father, funeral expenses, and doctor's bills, whether out of the personal property left by his father or defendant's earnings from the farm does not clearly appear; but it is pretty certain that there was not more than enough in value of such personal property to liquidate the same.

About all that was left of the father's estate was this 80 acres of land.

He also paid the funeral and other expenses of his mother's last sickness and death. After her decease he lived upon the land, and worked and controlled it as his own, improving it, and paying all taxes and assessments upon it.

He has always been in possession of the premises, either by actual occupancy himself or that of a tenant holding under him.

He shows, by a number of witnesses, that he purchased the share of his brother John, and paid him in full for the same. This purchase was made very soon after his father's death. It is evidenced by a contract put in proof by the complainant, and signed by John, dated, as complainant claims, November 30, 1849, and as defendant alleges, November, 30, 1844.

We are inclined to think, from an examination of the orig-

inal contract, that the date is meant for 1844, as claimed by the defendant.

He also proves by William A. Clark, who drew the instrument, that his brother John executed and delivered a deed of his interest to him sometime in the year 1850, at Brighton. This deed was afterwards given to John to take home with him to Ingham county, for his wife to sign and acknowledge. It is shown by the admissions of John to several persons that his wife would not sign the deed, but took it, and tore it up. One witness, Isaac Crippen, a farmer 46 years old, residing at Conway, Livingston county, testified that he was living with John Osborn in Ingham county, and saw the deed brought home by John, and heard it read by him; heard his wife say she would not sign it, and that she would burn it up.

John Osborn, after 1850, made no claim to Nathaniel Tompkins Osborn for his share in the estate, nor have any of his heirs done so. His daughter Luana Smith was 41 years old in 1885, and the other heirs have been a long time of age, except James.

We are satisfied from the evidence of the witnesses, and the long acquiescence of John Osborn and his heirs in the claim of title exercised by defendant, that he acquired the interest of said John by execution and delivery of the deed, as claimed by Nathaniel Tompkins Osborn and sworn to by William A. Clark.

The defendant, to prove his purchase of Lovina's interest, introduced a contract reading as follows:

" We, the undersigned, hereby certify by these presents that we have received, by notes, goods, chattels, sixty-five dollars, in full to our full satisfaction for all our right, title, claim, or demand, in whatever manner or shape, of Tompkins Osborn, this 27th, 1848, for which we hereby sign off all right, title, claim, or demand of the estate of Isachar Osborn, deceased.

" *In the year November 27, 1848.*
                    " HORACE W. VAN LEUVEN.
                    " LOVINA MARIA VAN LEUVEN.
  " Witness: ARMINDA WOOD."

It is claimed by complainant that neither Lovina nor her sister Arminda could write ; that the paper is fabricated, and for the purposes of this suit.   There is abundant evidence, however, to show that both of them could write.   .

It is also urged that if it was an honest document it would not bear two dates, and that all of the paper after the date " this 27th, 1848," has been written after Lovina's death, for the purpose of defeating the claim of her heirs in the premises.

An inspection and careful examination of the original document on file in this Court leads us to the conclusion that no portion of the paper has been fabricated.   We are satisfied that it was all written with the same ink, and at the same time.   Some of the writing in the body of the instrument, and the signatures, are cramped and distorted for want of room.

In those early days in Michigan, paper was not so plenty as now, and more economy was practiced in the use of space thereon.   The paper is a narrow piece, and about all of its surface is utilized.   We can detect no evidence of forgery in the signatures, and discover no signs of a portion of the writing being added at a later date, as claimed by complainant's counsel.

With the great preponderance of evidence before us showing that both Lovina and Arminda could write, we must believe the document a genuine one, as alleged by the defendant.

Lovina died in 1856.   Her youngest heir is therefore over thirty years of age.   Eliza Ann Arms was thirty in 1885. Neither she nor her brother or sister ever made any claim to the defendant for any share in the estate as belonging to their mother.

Bethel Osborn and his wife, Hannah M., both testify that Lovina told them that she had sold her interest to her brother Nathaniel Tompkins Osborn ; and Bethel identifies the signatures of Lovina and her husband to the paper.   Benjamin Blaine, a farmer 74 years of age, testifies that Tompkins Osborn brought this paper to him in 1852 or 1853, and requested him to keep it, as Horace Van Leuven, the husband of Lov-

ina, was trying to steal his papers. At the same time he left with him, also, the contract heretofore referred to, signed by his brother John. He kept both documents two or three years, and then delivered them back to Tompkins Osborn, the defendant. Blaine swears that the paper, as he believes, was the same then as it is now, with the same three names signed thereto.

Defendant Tompkins Osborn shows no deed or other writing from his sister Arminda, but proves by his brother Bethel and other witnesses that Arminda admitted to them that she had sold her interest to defendant, and received therefor a yoke of oxen and twenty bushels of wheat. This was two or three years before her mother died, and in 1847 or 1848. Arminda lived over twenty-one years thereafter, and made no claim to Tompkins for any share of the estate.

Silas Wood, the husband of Arminda, a witness for complainant, admits that they had the cattle of Tompkins, but claims they were received in payment of his wife's share of the personal property. This, however, is not consistent with the facts, as there was not personal property enough to give her this amount, and what there was, was under the control and for the use of the mother while she lived.

In the fall of 1854, Silas Wood and his wife, Arminda, moved upon the premises, and built a house thereon, and lived there until his wife's death.

It is claimed by complainant's counsel that this possession was taken under a claim of right by Arminda, as a co-tenant of the land with Tompkins, and that she maintained such possession under such claim until her death; and that during this time Tompkins repeatedly tried to buy her out, but she would not sell.

This is substantiated only by the testimony of her husband, whose evidence is contradicted by disinterested witnesses upon so many other points, especially in relation to his wife being unable to write, that we do not feel disposed to rely upon it. He admits that he worked the place during the time upon shares, giving one-half of the crops to Tompkins, who furnished teams, seed, etc. He claims to have occupied

and worked, however, three acres exclusively. He testifies that in 1854 he moved upon the premises at the request of the defendant, who told him to clear off the three acres and build upon it, and that was the reason he built upon the premises.

After he moved off the premises, in 1870, he never made any claim to Tompkins for any share in the land for his children, who were, at the time of the filing of the bill, of the ages, respectively, of 37, 32, 28, 24, and 22 years.

Defendant has the title of four of these children, so that the only interest in controversy is that of Alfred S., the youngest, who, it appears, was not of age, by his father's record of his birth, when he deeded to complainant. Since the filing of the bill, however, Hyne has secured another conveyance from him.

It is argued by the counsel for complainant that the fact of defendant's purchasing the title of the Wood heirs militates strongly against his claim that he acquired their mother's interest before her death, or paid her for it.

We do not think so. He had no conveyance, or any writing whatever, from her, in support of his title under her, and it was natural that he should seek to obtain deeds from her children to remedy the defect.

We think the testimony shows conclusively that the defendant purchased the rights of his sisters Lovina and Arminda to this land before their mother's death, and held adverse possession of the same against Arminda for 20 years before she died. This disposes of the claim of complainant under her.

In Lovina's case, the paper writing shows that in 1848 she sold her interest to defendant, and he paid her for it. Such paper shows an equitable title to the land, and can be considered as a written contract of sale, which has been performed upon defendant's part, and which would have entitled him to a decree quieting his title as against her heirs, had he seen fit to file one: *Hardy v. Powell*, 40 Mich. 413; *Twiss v. George*, 33 Id. 253; *Godfroy v. Disbrow*, Walk. Ch. 260–265.

The long acquiescence of these heirs satisfies us that they

understood that their mother had sold her interest to defendant.

The complainant has no particular equity that he can present to the court in support of his title. He is 34 years of age; was born within a mile of these premises, and has lived near them all his life. He has known of defendant's occupancy all these years. After one generation has passed away, and most of the original heirs to this property are dead, without having any talk with the defendant as to the character of his possession or claim of title, he hunts out the defects in the record title, and searches about the county for the children of John, Lovina, and Arminda, and acquires their quitclaims for from $25 to $50 each, and then, armed with a paper title to eleven twenty-fifths of the premises, first makes known his claim to his neighbor from earliest boyhood.

Such conduct, and such speculations, should not be favored by courts of equity.

He has the right, notwithstanding, to stand upon his strict legal rights, and ask their enforcement; but the law cannot be strained to aid him, nor can he have the benefit of any doubts in the settlement of the question in issue.

He has taken with full notice of defendant's possession. Without inquiry as to the extent of such possession, and what interest in the premises was claimed under it, he has seen fit to purchase stale claims to the land. He is therefore a holder of such claims subject to all the equities between defendant and the ancestors of the heirs of whom he purchased. The very fact, in my mind, that Hyne slipped around and secured those quitclaim deeds from these heirs without the knowledge of the defendant, and without any talk with him whatever as to his title, shows that he knew he was engaged in a mean business, and knew that he was speculating upon the infirmities of the legal title, when in equity it was good, or liable to be so.

In the view that I take of the case, the defendant has shown a purchase of the interest of all his brothers and sisters in this land nearly 40 years ago; that he paid valuable consideration for each interest, and all that they claimed;

that while the brothers and sisters lived they found no fault with the sale, and made no claim to him of any further interest in the premises; that their heirs, none of them, ever made any claim to the land to defendant, or in his presence. As to John's interest, it passed by formal conveyance and delivery. The subsequent destruction of the deed did not lessen or impair the title granted by it: *Warren v. Tobey,* 32 Mich. 45.

As to Arminda's share, she was precluded, within her lifetime, by the operation of the statute of limitations, from asserting any right to the premises in the face of the 20-years adverse enjoyment of her brother.

Lovina's conveyance to defendant is evidenced by a paper writing, lacking the legal formalities of a good deed, but sufficient to give defendant an equitable right to her interest, which long years of acquiescence by her and her heirs has strengthened and made more manifestly equitable.

It ought to have, and does have, in my opinion, to say the least, the effect of a written contract for the sale of her share, fully performed by defendant, and ratified by his holding possession so long without question.

If it had not been, in all probability, for the greed of the complainant, and his desire to make money in what must be regarded as a questionable way, out of the ignorance or carelessness of the defendant in not having the transfers formally and legally made in the first place, this old man would have always enjoyed, without trouble or litigation, the possession and ownership of this, all the land he has ever possessed.

The complainant relies strongly upon admissions of the defendant that he had not the interest of all the heirs; but these admissions are denied by him, and are proven, in nearly every case, by the complainant and his brother and father, and their employes, or by some of the heirs through whom complainant claims title.

The court below was right in dismissing complainant's bill, and the decree below will be affirmed, with costs.

The other Justices concurred.