Argued October 23, decided December 17, 1907; rehearing denied March 17, 1908.

## KUNZ v. OREGON RAILROAD & N. CO.

[93 Pac. 141; 94 Pac. 504.]

RAILROADS—INJURIES AT CROSSINGS—ACTIONS—EVIDENCE—VIOLATING SPEED ORDINANCE.

1. In an action for the killing of a person at a crossing, the fact that the engine was travelling 20 or 30 miles an hour across a public grade road in a city where the lawful speed was 6 miles an hour, is a circumstance from which the railroad's negligence might reasonably be inferred by the jury, especially where, in consequence of obstructions to a view of the train, a person was prevented from seeing a locomotive at any great distance until he came within about 50 feet of the crossing.

SAME—VIOLATION OF SPEED ORDINANCE.

2. To authorize a recovery for a personal injury on the ground of a railroad's negligence in violating a speed ordinance, it must appear that the hurt was caused by the unlawful speed without contributory negligence of the injured person.

SAME—RIGHT OF PERSON TO USE RAILROAD CROSSING.

3. A traveler on a public road that intersects a railway at grade, is entitled to use the crossing, subject to the railroad company's superior right of way, to which, when he has notice of the approach of a train, he must yield.

SAME—DUTY TO LOOK AND LISTEN.

4. A traveler, before undertaking to cross a railroad, must look along the track in each direction for an approaching train, and if the view is at all obstructed, he must listen, and if he fails to do so without a reasonable excuse, he is negligent.

SAME—VIOLATION OF SPEED ORDINANCE—PRESUMPTION THAT TRAINS RUN AT LEGAL RATE.

5. In the absence of evidence to the contrary, a person approaching a railroad crossing in a city, may presume that the railroad will not run its trains at a greater rate of speed than allowed by the city ordinance.

SAME.

6. Whether decedent, killed at a railway crossing, was negligent at the time, *held,* under the evidence, for the jury.

SAME—TRIAL—QUESTIONS FOR JURY.

7. Though the negligence of one party cannot be set up by the other as an excuse for the want of care on his part, yet when, in an action for a personal injury, it appears from plaintiff's testimony that the harm was caused by the negligence of the defendant railroad in operating a train, a judgment of non-suit should not be given unless it is manifest that the person injured was negligent.

RAILROADS—INJURIES AT CROSSINGS—PLEADING—REASONABLENESS OF ORDINANCE.

8. It will be presumed that ordinances regulating speed of trains within a city are reasonable, and in an action for an injury resulting from a violation of such ordinance, it is not necessary for plaintiff to state in the complaint that the ordinance in question was suitable to the place where the injury occurred.

SAME—MUNICIPAL REGULATIONS—POWER TO REGULATE.

9. Where no unreasonable extent of territory is included in a city, and there are public streets and road crossings through the sparsely settled portions that cross the tracks of railroads, the city has the right by ordinance, for the protection of the public, to regulate the speed of trains to a reasonable limit.

SAME—INJURIES AT CROSSINGS—VIOLATION OF SPEED ORDINANCE—PRESUMPTION AS TO COMPLIANCE.

10. A person injured at a railroad crossing of a city street has the right to presume that a train will not be run at a rate of speed exceeding the limit prescribed by the ordinance.

SAME—KNOWLEDGE OF VIOLATION.

11. Where one injured at a railroad crossing lived about two miles therefrom, this distance was so remote that he was not chargeable with knowledge of the time the train in question usually crossed the road, or of the speed which it generally made at that place, though the velocity on the day of the accident and the injured person's departure from his home on that day were usual.

SAME—QUESTION FOR JURY—REASONABLENESS OF SIGNAL BY APPROACHING TRAIN.

12. In an action for an injury at a railroad crossing, the question whether or not the notice of the approach of a train by sounding a whistle was reasonable, was for the jury.

COURTS—APPEAL—DECISION—FORM—"SUPPOSED."

13. In an action for an injury at a railroad crossing, the testimony did not disclose whether or not the engineer saw the team of plaintiff's intestate on the track, as intimated, and on appeal the court in its decision stated: "If the facts thus supposed were true, and the engineer, seeing the team standing on the track under the circumstances mentioned, immediately used all available appliances to stop the train, the question of such care would nevertheless be for the jury to determine." *Held*, that the word "supposed" was advisedly used, and was not objectionable as authorizing a judgment to rest on conjecture.

From Multnomah: JOHN B. CLELAND, Judge.

Statement by MR. JUSTICE MOORE.

This is an action by Martha M. Kunz, as administratrix of the estate of her husband, David H. Kunz, against

the Oregon Railroad & Navigation Company, a corporation, to recover damages occasioned by his death, which was caused November 21, 1904, by his being struck by a locomotive drawing a passenger train as he was crossing the defendant's railroad, at grade on a public highway within the corporate limits of the City of Portland. The negligence alleged as a basis for the recovery is, in effect, that the defendant's agents, without giving any warning of approaching the crossing, operated the engine, which caused the injury, at the unlawful and dangerous velocity of about forty miles an hour, in violation of municipal regulations, limiting the rate of speed of railroad locomotives within the corporate limits of the city to six miles an hour, and prescribing a penalty for a violation thereof; that if such agents had carefully observed the track, they could have seen the intestate crossing in front of the engine and checked its speed, thereby avoiding any injury; and that, because of a curve in the railroad and of such unlawful speed, it was impossible for the decedent, or any ordinarily prudent person, to have seen the train or heard its approach until it was too late to prevent a collision with it. The complaint states in detail the situation of the public crossing, and avers its constant use by many persons, which facts were well known to the defendant; that the City of Portland is duly incorporated, and its common council, pursuant to a legislative grant, enacted ordinances, limiting the rate of speed of railroad lomomotives as mentioned, copies of which municipal law are set out; and further alleging the several duties imposed on the defendant's agents in operating the engine, and their neglect to comply with such requirements.

The answer denied the material allegations of the complaint, and averred, *inter alia,* that the intestate lost his life in consequence of his own negligence. The reply put in issue the allegations of new matter in the answer, and the cause coming on regularly for trial, the court, upon

the motion of defendant's counsel, granted a judgment of nonsuit at the close of the testimony introduced by the plaintiff, and she appeals.                    REVERSED.

For appellant there was a brief and an oral argument by *Mr. Ralph R. Duniway.*

For respondent there was a brief and an oral argument by *Mr. Arthur C. Spencer.*

MR. JUSTICE MOORE delivered the opinion of the court.

Numerous errors are assigned by plaintiff's counsel on the ground that the court rejected testimony which he offered, and also admitted on the cross-examination of his witnesses testimony which the defendant's counsel was permitted, over objection and exception, to elicit. If it be conceded that the court's rulings in these respects were erroneous, the action complained of would not be prejudicial, provided the judgment of nonsuit was properly given. To determine this question, the *locus in quo* will be particularly described, and the testimony introduced by the plaintiff's counsel, together with the cross-examination of his witnesses, to which no objection was interposed, will be detailed, from which may be inferred the degree of care exercised by the decedent.

Considering the courses respectively pursued by the train and by Kunz at the time and place of the accident, as they proceeded toward Portland, the defendant's railroad, within the limits of that city, is constructed northwesterly at the place where it is crossed at grade by the Sandy Road, a public highway extending southwesterly at the acute angle of 49 degrees and 45 minutes, as disclosed by a blue print received in evidence. At a point in the center of the Sandy Road 90 feet southwesterly from its intersection with the railroad, the Barr Road, another public highway, commences and extends due east, intersecting the railroad at a point 170 feet southeasterly from the Sandy Road crossing. A cattle guard has been constructed across the railroad 350 feet south-

easterly from the Sandy Road intersection, and in the
same direction, at a point 1,500 feet from such crossing,
a whistling post has been set at the side of the railroad.
This post indicates the place where the warning signal
should be given to announce the approach of a loco-
motive from the east toward the crossings mentioned.   A
short distance southeasterly from the whistling post the
railway is again interstected by the Wiberg Lane.   The
railroad is constructed through a cut which commences
near the cattle guard and gradually grows deeper as it
extends toward the whistling post, the northerly bank
attaining at the highest place an altitude of ten or four-
teen feet.   A hedge has been planted on the south side
of the Barr Road for some distance east from its inter-
section with the railroad.   A dwelling, occupied at the
time of the accident by W. H. Moss, stands on the south-
erly side of the Sandy Road, 405 feet from the crossing,
and between this dwelling and the intersection, on the
same side of the public road, is situated another house,
which at that time was vacant.   From a point on such
highway 583 feet northeasterly from the crossing a per-
son can look over the hedge and bank mentioned and
see a locomotive coming west as it emerges from the cut
at a point 633 feet from the Sandy Road crossing, but
the smokestack of the engine can be seen farther away.
It will thus be seen that, in consequence of the excava-
tion and also of the houses mentioned, an extended view
of the railroad east of the crossing cannot be obtained
by a person traveling on the Sandy Road toward Port-
land, but when he reaches a point on that highway about
fifty feet from the crossing the testimony discloses that
he can behold the track almost to the whistling post.

The admitted facts are that on November 21, 1904,
about 8 o'clock in the morning of a fair day, Kunz drove
toward Portland a pair of horses hitched to a wagon that
was loaded with farm produce, and as he attempted to
cross the railway at the Sandy Road intersection, a loco-

motive drawing a passenger train which was about on schedule time, and also going in the same direction, collided with him, which resulted in killing the horses, breaking the wagon and harness, scattering the produce, and injuring him so that in a few hours thereafter he died.

1. W. H. Moss, who, it will be remembered, resided near the Sandy Road crossing, testified for the plaintiff that on the morning of the collision he saw Mr. Kunz pass, driving his team at the rate of two, or possibly three miles an hour; that when Kunz was probably within forty or fifty feet from the track, the danger whistle was sounded by the engineer just beyond the cattle guard near the Barr Road; that the train was then running from twenty to thirty miles an hour. In answer to the question, "How much time elapsed between the sounding of this danger whistle right at the cattle guard and the engine hitting the horses?" the witness replied: "Well, it was very quick. Of course, I could not tell you the exact time. All my recollection is I looked around when the locomotive blowed the alarm whistle, I looked around, and saw the train's momentum slackening, and I looked instantly back and his team was standing square on the crossing, right on the crossing of the track—standing there—and he just made a motion as if he was rushing his horses forward or back, and he was gone that quick (the witness slapping his hands together)." On cross-examination Mr. Moss was asked, "How soon after Mr. Kunz drove up on that morning was it before you heard the whistle of the train?" and answered: "Well, I heard the whistle of the train just as he passed by my house. I heard them whistling on up above, towards Montavilla when he passed by the house."

"Q. Did you see or observe him as he continued to drive from your house down the track?

A. Yes, sir; I observed him.

Q. Did you notice whether he was looking or listening for the approach of that train?

A. Well, I didn't see him looking, or notice him do anything in particular at all. * * He was smoking along leisurely, and I didn't see that he paid any attention at all. That is what caused me to stop and remain on the platform looking at him, wondering why he wasn't spurring up his team, or something of that kind, because I heard the whistle coming down along the road above there.

Q. And did you hear them at the whistling post above there?

A. Well, we didn't know where it was. I did not.

Q. They were up in that location up there?

A. Yes; I could not tell whether it was the Wiberg Lane, or where it was.

Q. There is not much difference between the Wiberg Lane and the whistling post?

A. No, not at all.

Q. Anyway, it was whistling rapidly coming down through there, was it not?

A. Yes; I heard a whistle two or three times before the accident.

Q. Did you see him turn his head, or not?

A. No.

Q. Now he was walking his team as he went along the road there as he passed your house?

A. Yes, sir.

Q. What is the fact as to whether he got them into a trot or not?

A. That I could not say, because I never seen the horses trotting, to my recollection. They might have trotted a little down toward the bottom of the grade, but not to my recollection. * *

Q. And you saw the engine coming down in full sight, and whistling before he got onto the crossing?

A. Just as I tell you. As he was just going up to the—approaching to the—railroad crossing, I heard the alarm whistle, and of course I turned my head that way instantly, and I turned back instantly as quick as I had looked, and seen the train was so close to him, and then, as I said before, the horses was right on the track."

The plaintiff's counsel, on redirect examination of the witness, in referring to the first alarm he observed on the morning of the accident, inquired: "How far above your house on the railroad was that whistling that you heard?" and received the following answer: "Well, I should judge it was somewheres in the neighborhood of 2½ miles or 3 miles."

"Q. And at the time you heard that whistling above Montavilla, 2½ miles or so away, whereabouts was Mr. Kunz, and what was he doing?

A. He was driving along the road.

Q. Between your house and the railroad crossing at Sandy?

A. Yes, sir. * *

Q. From the time you heard the whistle up above the Wiberg Lane, which caused you to be apprehensive of a disaster at this point, how long was it, and when was it that you next heard a distinct whistle from the engine, which you can recall?

A. Well, the next whistle that I heard was the alarm whistle which was very shortly after the last whistle.

Q. Where was the position of the engine at that time?

A. Right above the cattle guard at the Barr Road. * *

Q. At this time did you hear the bell on the engine ringing?

A. Not to my recollection.

Q. Now counsel asked you about Mr. Kunz looking or listening. You were standing back of Mr. Kunz as he went down towards the railroad track?

A. Yes, sir.

Q. And you had a view of the back of his head?

A. Yes, sir.

Q. You could not see his eyes, as to whether they were open or not?

A. No, sir.

Q. State whether or not as Mr. Kunz went past your house and down towards the Sandy Road, whether this Sandy Road crossing was right in front of him for 200 or 300 feet?

A. Why, of course it is in plain view of him there, certainly.

Q. Then what is the fact as to whether it was necessary for Mr. Kunz to turn his head in order to see 200 or 300 feet of that railway in front of him?

A. Well, it wasn't absolutely necessary for him at that time, but after he passed that house—that little house that obstructed the way, the view—then it would be necessary for him to turn around in that direction to look up the track" (witness illustrating).

Mrs. W. H. Moss, as plaintiff's witness, testified that she saw Mr. Kunz on the morning of the accident driving slowly down towards the track, and was asked:

"Q. State whether or not you heard the whistle of the train away up above, about Montavilla, at that time?

A. Well, I heard whistles all the way up that way. I don't know where they were."

On cross-examination this witness was interrogated as follows:

"Q. You heard the train whistling up above?
A. Yes, sir.

Q. And you saw Mr. Kunz driving for that crossing?
A. Yes, sir.

Q. You noticed that he was not paying a bit of attention to the fact that the train was coming?
A. He didn't seem like it."

This witness, on redirect examination, was asked:

"Q. Mrs. Moss, when you say the man was paying no attention, isn't it a fact that he was driving toward the crossing with his eyes right toward it, and you could see only the back of his head?

A. Well, he didn't seem to notice that there was a train coming, although we did—

Q. Yes, but the fact—"

(The defendant's counsel, interrupting, said: "Let her finish her answer.") The witness, continuing, said:

"A. But we could hear the train. We could hear it coming, although we never stopped to see it. We didn't see it, but we knew the train was coming. We could hear the noise."

The court thereupon inquired: "You mean you could hear the noise of the train?"

"A. The roar of the train coming, yes, sir.

Q. Mr. Kunz gave no sign of hearing it himself?

A. I don't think so.   He didn't seem to.

Q. But Mr. Kunz, as he drove down there, could see the crossing right in front of him, could he not, without turning his head?

A. Yes, sir; he could see the crossing; yes, sir.

Q. And you don't undertake to say as to whether or not he used, or did not use, his sense of hearing, as he was going down there, do you?

A. No, I don't know.

Q. That you could not say?

A. No.

Q. When the last danger whistle was given, just before the train hit him, what, if anything, did Mr. Kunz do?

A. Well, there is a little slope there before the track, and the horses trotted.   I don't know whether he made the horses trot.   Anyway, they trotted on that little slope, and then he got on the track and he tried to make the horses go ahead, and they would not go ahead, and he tried to make them come back, and they would not go back, and he waved his hand, and then the alarm whistle you know, the danger whistle.

Q. Was that alarm whistle before or after he moved his hands?

A. No, it was after.

Q. That was after?

A. I think it was after.   I could not say for sure.

Q. You are not sure about that?

A. No; I was excited."

The testimony shows that at the time of his death Mr. Kunz was 41 years old, possessed all his faculties, and was in perfect health and happy; that he was a farmer, and knew how to manage horses; that the team which was killed was gentle, good and true; and that four or five times a week he drove over the Sandy Road to Portland.   It is fair to infer that the train runs down grade from the whistling post mentioned to the crossing where Kunz was injured, for O. Pullen, as plaintiff's witness, testified that after the engineer passes Wiberg

Lane, going towards Portland, he seems to shut off steam, and the locomotive does not emit such a quantity of smoke as is discharged by it at that place when going in an opposite direction.

The foregoing testimony, and the legitimate inferences that are deducible therefrom, fairly present the manner in which the defendant's servants operated the engine and train as they approached the crossing on the day of the accident, and also show the attention which Kunz paid to the dangerous instrumentality as he drove his team to the place where the collision occurred.

The acts of the defendant's servants in permitting an engine operated by them to attain a velocity of twenty or thirty miles an hour across a public road at grade in the City of Portland, where the rate of speed of a locomotive had been limited to six miles an hour, is a circumstance from which negligence might reasonably have been inferred by the jury, and particularly so, when, in consequence of a deep cut and of other obstructions to a view of the train going towards that city, a person on the highway was prevented from seeing a locomotive at any great distance until he reached a point on the public road about fifty feet from the crossing: 23 Am. & Eng. Ency. Law (2 ed.), 760; 4 Cur. Law, 1208; *Beck* v. *Vancouver Ry. Co.* 25 Or. 33 (34 Pac. 753) ; 2 Shearman & Redfield, Neg. (5 ed.) § 467; *Correll* v. *Burlington Ry. Co.* 38 Iowa, 120 (18 Am. Rep. 22) ; *Karle* v. *Kansas City Ry. Co.* 55 Mo. 476; *Kolb* v. *St. Louis Trans. Co.* 102 Mo. App. 143 (76 S. W. 1050) ; *Crosby* v. *New York Central Ry. Co.* 88 Hun, 196 (34 N. Y. Supp. 714) ; *Gratiot* v. *Missouri Pac. Ry. Co.* 116 Mo. 450 (16 S. W. 384).

2. Though the courts of last resort differ as to the degree of negligence which they declare will result from a violation of a statute or of a municipal ordinance regulating the rate of speed of railroad locomotives, the adjudications on this subject are quite uniform in holding that, to authorize a recovery for a personal injury, it

must satisfactorily appear that the hurt was caused by such unlawful speed, without any direct contributory negligence on the part of the person sustaining the harm: 23 Am. & Eng. Ency. Law (2 ed.), 760; Pierce, Railroads, 354; Wood, Railroads (Minor's Ed.), 1515.

3. A traveler on a public road that intersects a railway at grade, is entitled to use the crossing; but as passengers and freight, when transported by rail, must be carried with speed, a locomotive and the cars which it draws have the right of way to which a person, desiring to cross the track, and having reasonable notice of the near approach of a train, must yield on the ground that in doing so the greatest good will result to the greatest number: Pierce, Railroads, 342; Wood, Railroads (Minor's Ed.), 1510; *Continental Improvement Co.* v. *Stead,* 95 U. S. (5 Otto) 161 (24 L. Ed. 403). If a contrary rule prevailed, the operation of trains would be practically prevented across streets at grade in cities where many persons are constantly passing.

4. This standard of care makes it incumbent upon a traveler, before undertaking to cross a railroad, to look along the track in each direction for an approaching train, and if the view is at all obstructed, he must listen; and a failure to comply with these requirements, without a reasonable excuse, is deemed negligence: *Durbin* v. *O. R. & N. Co.* 17 Or. 5 (17 Pac. 5: 11 Am. St. Rep. 778); *McBride* v. *N. P. R. Co.* 19 Or. 64 (23 Pac. 814); *Hecker* v. *Oregon R. Co.* 40 Or. 6 (66 Pac. 270).

5. It might appear from an examination of the testimony hereinbefore set out that Kunz did not look in either direction along the railroad before attempting to cross it; but, as disclosed by the sworn statements of Mr. and Mrs. Moss, his back was towards them as he drove his team further away, and this being so, a turn of his head to the left, sufficient to overcome the acute angle formed by the county road and the railway, may not have been observed by them. It will be remembered that Moss

first heard the whistle of the locomotive about two and one half or three miles distant, when the train approached Montavilla, and next heard it near the whistling post, 1,500 feet from the Sandy Road crossing. As Kunz possessed all his faculties, it is right to infer, since he was nearer the track than either Mr. or Mrs. Moss, that he also heard the alarm blasts that had been given, and in the absence of any evidence to the contrary, he was authorized to presume that the defendant's agents would obey the municipal requirement and not run the train at a greater rate of speed than six miles an hour: *Moore* v. *Chicago Ry. Co.* 102 Iowa, 595 (71 N. W. 569); *Cleveland Ry. Co.* v. *Harrington,* 131 Ind. 426 (30 N. E. 37). Assuming that the first whistle was given two and one half miles east of the crossing and at a time when the team was less than 405 feet distant therefrom, the train necessarily traveled more than thirty-two times faster than the horses, so that if Kunz had looked easterly along the track when the first opportunity occurred, which presents itself at a point within fifty feet of the intersection, he could not have seen the engine, which then must have been east of the whistling post and beyond a curve in the railway. If the testimony of Mr. Moss is controlling, however, the judgment of nonsuit was properly given, for it appears from his sworn statements that Kunz was about forty or fifty feet from the crossing when the danger whistle was sounded right above the cattle guard, near the Barr Road, and that the speed of the train was immediately slackened. It would thus appear that, while the team traversed this forty or fifty feet to the place of collision, the train passed over 400 or 500 feet of the railway to the same locality, thus making the sworn statements of this witness consistent; that the speed of the team and the train was, respectively, three and thirty miles an hour. Moss admits that the team was standing on the track, and that Kunz made a motion as if he was rushing his horses forward or backward.

It is impossible to determine the length of time the team stood on the crossing, but that the horses halted at all on the railroad track tends to show that the estimate of the distance relatively traveled by the team and train may have been incorrect. It will be remembered that Mrs. Moss, in answer to the inquiry as to what Kunz did after the danger whistle was sounded, replied that his horses trotted down an incline of the public road towards the crossing. It might, at first, appear from this answer that it corroborated the testimony of her husband to the effect that the team had not reached the railroad when the last blast of the whistle was given. When her entire testimony is considered, however, we think it is evident that she understood the danger whistle, to which her attention was called, to mean the warning given by the engineer at the whistling post near the Wiberg Lane, and not the alarm sounded near the cattle guard, for after answering the inquiry as indicated, she said that when the team refused to start forward or backward across the track, Kunz signaled the engineer before the alarm whistle was sounded. She subsequently qualified that statement by declaring she thought the whistle was given after he waved his hand, and thereafter further restricted her testimony by saying that she was not sure about the matter, because of being excited at the time. It is fairly to be inferred from her sworn statements that Kunz had reached the crossing before he saw the approaching train; that the horses unexpectedly halted at the intersection; and that as he observed the locomotive bearing down on him he waved his hand, whereupon the engineer gave the alarm whistle and began to check the speed of the train. No testimony was introduced at the trial tending to show that more than three whistles were given or heard—the first probably east of Montavilla, the second near the Wiberg Lane, and the third, or danger, signal, near the cattle guard. If the team was standing on the railroad track when the danger signal was given,

Kunz could not well have been forty or fifty feet from the track at that time, as stated by Mr. Moss.

6. Considering as true all the favorable testimony given by plaintiff's witnesses, and all reasonable inferences deducible therefrom that tend to support the cause of action, as is required to be done in passing upon a motion for a judgment of nonsuit, we think a fair construction of such evidence leads to the following conclusion: That when the whistle was sounded near the Wiberg Lane, Kunz heard the signal, and presumed, as he had the right to do in the absence of any evidence to the contrary, that the train would not be run at a greater velocity than six miles an hour, which would allow him ample time to cross the track; that he attempted to do so, when his horses unexpectedly balked on the railroad and could neither be urged forward nor forced backward; and that in this situation he saw the train rapidly approaching and signaled the engineer to stop the locomotive. The horses driven by Kunz being gentle, good, and true, as disclosed by the testimony, it is reasonably to be inferred that he could not have supposed that the team would refuse to proceed across the railroad track when the place of danger had been reached. Whether or not the engineer saw the team on the track at such a reasonable distance that he knew the horses had sufficient time to pass over the crossing before the locomotive could reach that place and hence had the right to assume, in the absence of any knowledge to the contrary, that Kunz was in the possession of all his faculties and had seen or heard the approaching train, and that the horses were tractable and would proceed across the intersection, is not disclosed by the testimony. If the facts thus supposed were true, and the engineer, seeing the team standing on the track, under the circumstances mentioned, immediately used all available appliances to stop the train, the question as to the measure of such care would nevertheless be for the jury to determine.

7. Though the negligence of one party cannot be set up by the other as an excuse for the want of care on the part of the latter (Wood, Railroads, 1537), yet, when, in the trial of a cause instituted to recover damages for a personal injury, it appears from plaintiff's testimony that the harm was caused by the negligence of the agents or servants of a railway company in operating a train, a judgment of nonsuit ought not to be given unless it is manifest that the person hurt was guilty of contributory negligence: 7 Am. & Eng. Ency. Law (2 ed.), 434; *Bluedorn* v. *Missouri Pac. Ry. Co.* 108 Mo. 439 (18 S. W. 1103: 32 Am. St. Rep. 615). As this degree of proof is not disclosed by the construction which we have given to the testimony of Mrs. Moss, the judgment is reversed, and a new trial ordered.                REVERSED.

Decided March 17, 1908.
## ON MOTION FOR REHEARING.

[94 Pac. 504.]

MR. JUSTICE MOORE delivered the opinion of the court.

8. In a petition for a rehearing it is insisted by defendant's counsel that in the former opinion herein, a correct application of the law was not made to the facts involved in declaring that, in the absence of any evidence to the contrary, Mr. Kunz was authorized to presume that the defendant's agents would obey the provisions of the ordinance, and not operate the train at a greater rate of speed than six miles an hour, as limited by the municipal regulation. It is argued that the testimony given at the trial and certain photographs of the *locus in quo* introduced in evidence show that the injury complained of was not received on a city street, but at a country road crossing, and, though the highway is within the limits of Portland, the ordinance regulating the speed of trains in that city, as applied to the place where the hurt was sustained, is unreasonable, and therefore void. The testimony further discloses that Kunz almost daily passed over the railroad at the crossing where he was

injured; that he was well aware of the speed usually made at that place by the train; that he knew it was the time for its arrival; and that he heard the roar of the car wheels and the whistle of the engine, calling for the Sandy Road crossing, and, if it be assumed that he gave any attention to these warnings, which is denied, and concluded he could safely pass in front of the engine, but miscalculated its distance or velocity and was injured in consequence of his temerity, no presumption should be indulged to excuse his culpable neglect.

Considering these subjects in the order in which they are presented, U. Mitchel and S. Pullen testified that the city boundary was about 300 yards and a quarter of a mile, respectively, east of the Sandy Road crossing. The defendant's counsel, referring to the crossing, inquired of B. F. Roberts, on cross-examination, "The whole country around there is not built up with houses?" and received the following answer: "O, no; it is just country. It is not settled much. It is mostly farmers· live around there, and a brickyard is out there and some people." The latter witness also referred to two houses near the· crossing, and a field with brush growing by the fences. One of the photographs received in evidence shows the houses mentioned, and the other portrays the railroad and some trees. The witness Pullen, referring to these pictures, testified that they fairly represent the physical facts as they exist. George Gradtz, however, says· upon oath that no idea of the country could be formed from looking at the photographs, and W. H. Moss, referring thereto, testified that the pictures do not entirely represent the right of way of the railroad.

9. The legislature, in order to protect human life and to preserve property, has the undoubted right to regulate, by statute, the speed at which trains shall be operated in densely populated districts, and may delegate such power to a municipal corporation, which is authorized to execute it by enacting and enforcing such rules

as may be necessary to subserve the public welfare. The mails, when transported by rail, should be carried with dispatch, and business engagements demand that passengers, when conveyed by the same mode, should be conducted with that degree of speed that is compatible with their safety. A municipal regulation, prescribing the speed at which a locomotive can be run, may be so restrictive, however, as practically to defeat the very purpose sought to be accomplished by the operation of trains, thereby demonstrating that an ordinance is so unreasonable as to authorize a court to declare it ineffective: Elliott, Railroads (2 ed.), § 670. Thus, in *Meyers* v. *Chicago, Ry. Co.* 57 Iowa, 555 (10 N. W. 896), where an ordinance of a city limited the speed of railway trains to four miles an hour, and the defendant's road passed through agricultural lands, fenced on both sides, for three miles after entering the limits of the city, and before reaching the inhabited part thereof, it was held that the attempted municipal regulation operated as a restraint upon commerce, and, as to such part of the road, was unreasonable and void. In that case, which was an action to recover the value of a cow killed on the defendant's railroad, the only negligence alleged was that the train causing the injury was run at a greater speed than four miles an hour, in violation of an ordinance of Council Bluffs. A plat of the city was attached to the abstract, and the facts, respecting the location of the railroad, were stipulated by the parties, to the effect that the animal was killed at a crossing of a public road, laid out by the county, the highway where the injury was sustained being 1½ miles from the platted part of the city; that the railroad runs 3 miles within the city limits through farm lands before it reached the first laid out addition; and that the distance from where the railway first enters the city to the Union Pacific depot was more than 5 miles. It will thus be seen that all the facts there involved were before the court for its consideration

and determination.   In *Evison v. Chicago Ry. Co.*
45 Minn. 370 (48 N. W. 6: 11 L. R. A. 434), an ordi-
nance of the City of St. Paul limiting the speed of trains
within that municipality to four miles an hour, when
applied to the defendant's railroad, which for two miles
was built on the company's right of way that was se-
curely fenced on both sides, and extended through a
sparsely settled and comparatively unimproved country,
essentially rural in character, was held to be unreason-
able and void as to that part of the railroad in the suburbs
of the city.   In that case the negligence charged was
the running of a train within the limits of St. Paul at
a greater speed than four miles an hour, as prescribed
by an ordinance, and also in failing to ring a bell while
the train was in motion.   It was admitted that the train
was running at a rate of more than ten miles an hour.
When the cause was submitted, the trial court instructed
the jury that, "so far as the ordinance attempted to
limit the speed of trains to four miles an hour, it was,
in its application to defendant's road at the place of the
accident, and east therefrom to the city limits, unneces-
sary, unreasonable, and void."   The jury were directed,
however, to consider the testimony introduced, and to
determine therefrom whether or not the bell was rung
as required by law.   A general verdict was returned
for the defendant and a special finding made that the
bell was rung, and, judgment having been rendered
thereon, it was affirmed on appeal, the court holding
that the instruction, in relation to the speed prescribed
by the ordinance, as applied to the place of the accident,
was correct.   That cause, it will be observed, was tried
on its merits.   In *Studley v. St. Paul & Duluth Ry. Co.*
48 Minn. 249 (51 N. W. 115), the plaintiff's intestate,
a young woman, was struck by the defendant's loco-
motive, causing her death.   In an action to recover the
damages sustained, it was alleged in the complaint that
the engine drawing a train was run over a public cross-

ing at a speed of thirty miles an hour, in violation of an ordinance of the City of St. Paul prohibiting the operation of locomotives at a greater velocity than four miles an hour. The answer admitted the existence of the municipal regulation, but alleged that at the place where the injury occurred the ordinance was unnecessary, unreasonable, and void, and also asserted that the woman was hurt in consequence of her negligence while trespassing on the railroad. A verdict for the defendant was given, and, judgment having been rendered thereon, the plaintiff appealed. In affirming the judgment, it is stated in the opinion that the woman approached the railroad crossing on a public highway, which was nothing more than a county road, and when arriving at a point seventy feet from the track an unobstructed view thereof could have been observed for a mile in the direction from which the train causing the injury came; that, reaching a point about five or six feet from the track, she departed from the crossing, when the train was about fifty or sixty feet behind her, and, walking along the berm of the right of way, was struck and injured. It was conceded that the train was running about twenty miles an hour, and that the woman who was injured was accustomed to being about railway tracks and trains, and for a month prior to the accident had been employed at a house situated within three hundred feet of the place where the injury occurred. In deciding that case, Mr. Justice COLLINS, speaking for the court, says:

"We do not indorse the doctrine, if it anywhere exists, that a person may attempt to pass in front of a coming train at what is nothing more than a country crossing, relying solely upon the belief or on the expectation that the train will approach at a certain rate of speed."

It would seem that the language quoted is inapplicable to a street in a thickly settled part of a city where it may reasonably be inferred from the observation of

the court that a traveler on such public highway may, in the absence of any knowledge as to the rate of speed usually attained, attempt at a reasonable distance to pass in front of an approaching engine, relying upon a belief that the train which is being propelled will approach the crossing at a rate of speed regulated by municipal ordinance. In that case the answer denied that the ordinance was suitable to the location where the injury occurred. Testimony as to the character of the highway, intersected by the railroad, must have been received, for the court states that the crossing was nothing more than a county road.

10. In the case at bar, the complaint avers that the City of Portland is duly incorporated, and its common council, pursuant to legislative authority, enacted an ordinance limiting the rate of speed of locomotives to six miles an hour, setting forth a copy of the municipal regulation. The answer admits that Portland is a municipal corporation, and that the State of Oregon has conferred upon it certain police power, but denies, upon information and belief, the other averments in relation to the adoption of the ordinance. It will be presumed that ordinances enacted pursuant to an exercise of police power are reasonable (Elliott, Railroads [2 ed.], § 1082) ; and, as it is needless to allege a fact which the law will presume, it was unnecessary to state in the complaint that the ordinance in question was suitable to the place where the injury was inflicted (15 Ency. Pl. & Pr. 435). If it was desired to controvert the validity of the ordinance because of its unreasonableness when applied to the Sandy Road crossing, it would seem to have been necessary to admit, as in the case of *Studley* v. *St. Paul & Duluth Ry. Co.* 48 Minn. 249 (51 N. W. 115), the passage of the municipal regulation, if it was in fact enacted, and to have averred that it was unnecessary, unreasonable, and void as applied to the place where Kunz was hurt. Though a dif-

ference of opinion exists as to the necessity of pleading speed ordinances (3 Bates, Pl., Pr. & Forms, 2272), a sense of fairness suggests that the existence of such a municipal regulation should be alleged when an injury resulting from a violation thereof is relied upon as a basis of recovery for the damages sustained: Elliott, Railroads (2 ed.), § 1698. It would seem to be equally as essential, if the efficacy of a speed ordinance is to be challenged as void because of its alleged inapplicability to a particular locality, that notice thereof should be given by an averment in the answer, so as to overcome the presumption of reasonableness which the introduction in evidence of the municipal regulation affords, and also to give the adverse party an opportunity to prepare for trial on this branch of the case. Whether or not the doctrine thus announced should be regarded as a rule of pleading, is not of much importance so far as this cause is concerned; for, as the cases cited by defendant's counsel in support of this petition, and which have been reviewed herein, were tried on their merits, and opportunity was given to test the reasonableness of the municipal regulations, a judgment of nonsuit ought not to be based on the incidental remark of a witness or upon photographs of the *locus in quo*, where an injury was sustained, when it is impossible to state what the condition of the public highway is in the immediate vicinity. Where no unreasonable extent of territory is included in a city, and there are public streets and road crossings through the sparsely settled portion that cross the tracks of railroads, the city has the right by ordinance, in the protection of the public, to regulate the speed of trains to a reasonable limit: *Houston Ry. Co.* v. *Dillard* (Tex. Civ. App.), 94 S. W. 426. The rule is not lacking in support that a person injured at a crossing of a city street has a right to presume that a train will not be run at a rate of speed exceeding the limit prescribed by ordinance: *Colorado Ry. Co.* v. *Rob-*

*bins,* 30 Colo. 449 (71 Pac. 371) ; *Correll* v. *Burlington Ry. Co.* 38 Iowa, 120 (18 Am. Rep. 22) ; *Ramsey* v. *Louisville Ry. Co.* 89 Ky. 99 (20 S. W. 162) ; *Piper* v. *Chicago Ry. Co.* 77 Wis. 247 (46 N. W. 165).

11. Considering the other questions suggested by defendant's counsel, the testimony shows that for about two years prior to his death Kunz drove over the Sandy Road to and from Portland several times a week, and hence he knew of the existence of the railroad at the place where he was injured. How far he lived from the crossing, however, is not definitely disclosed. His widow testified that he left home in the morning of the accident about 7 o'clock, which was the usual hour of his departure. W. H. Moss testified that the injury occurred about 7:45 a. m., which was the time when the train generally passed that point, and that the team, which was driven by Kunz, traveled about two and one half or three miles an hour. It may be inferred if Kunz was not delayed on the day he was injured, that in the 45 minutes occupied in driving to the crossing that he lived from $1\frac{7}{8}$ to $2\frac{1}{4}$ miles therefrom. We think this distance is so remote that he was not chargeable with knowledge of the time the train in question usually crossed the Sandy Road, or of the speed which it generally made at that place, though the velocity of the train and the time of its arrival on the day of the accident and also the departure of Kunz from home appear to have been usual. If Kunz had lived near the intersection of the Sandy Road with the railroad, so that he could have seen the trains when they passed, calculated the speed with which they were run at that place, and was observing in these particulars, and if it appeared that the velocity attained exceeded the limit prescribed, no presumption could probably be indulged that he had the right to rely upon the engineer's observance of the ordinance regulating the operation of trains in the city. So, too, if it appeared from the testimony that prior to

the accident he had been at the Sandy Road intersection when the train causing the injury passed on schedule time, he would undoubtedly have been aware of its velocity and of the hour when it went over the crossing; and it is quite likely that no presumption to the contrary could have been invoked. No testimony of this kind was introduced at the trial, and, as Kunz lived at such a distance from the crossing as not to be chargeable with knowledge of the usual speed of the train or the time of its passing the Sandy Road intersection, we think the presumption adverted to is applicable. Kunz undoubtedly heard the roar of the train prior to his injury, but neither accurate knowledge of its speed nor very little information of its distance from him could reasonably have been ascertained by the auditory nerves. It is a well recognized fact in acoustics that a train passing over a culvert or a bridge, even at moderate speed, emits a volume of sound that is not furnished when it runs over a roadbed made of earth. It is also true that the distance at which the noise of a train can be recognized depends upon the direction and force of the wind, and other atmospheric conditions. The testimony introduced herein does not allude to any of these elements which might have tended to indicate the position of the train, in the absence of which, though the roar of the car wheels may have betokened the movement of an engine, the noise does not necessarily show its speed or distance.

12. If it was manifest from the testimony that the whistle was sounded at the whistling post, which is set to mark a signal for the Sandy Road crossing, and it conclusively appeared that Kunz thereafter attempted to pass in front of the engine, a very different question would have been presented. Mr. Moss, referring to the blast of the whistle given near that point, said: "I could not tell whether it was the Wiberg Lane, or where it was." In answer to the inquiry, "There is not much difference between the Wiberg Lane and the whistling

post?" he replied, "No; not at all." In the former opinion it was inferred that Wiberg Lane is a public highway, intersecting the railroad, and that a whistling post had been set easterly thereof to indicate the place where warning should be given of the approach of a locomotive from that direction towards such crossing. We also thought it fairly inferable from the testimony that no blast from the engine was given at the whistling post which stands 1,500 feet from the Sandy Road crossing, and, as the distance from such post to the Wiberg Lane was not definitely stated, the whistle which was sounded, and which Kunz must have heard, was a signal for the latter highway, and not for the crossing where he was injured. If it be assumed, however, that the whistle which was sounded near the Wiberg Lane was not to announce the advent of the locomotive at that crossing, but was a call for the Sandy Road intersection, as the alarm was not given at the proper place and the distance between the lane and the whistling post, set 1,500 feet southeasterly from the crossing where Kunz was injured, is not definitely disclosed from the testimony, the question of whether or not the approach of the train was announced at a point near enough to the Sandy Road crossing to afford reasonable notice of the danger, becomes an important inquiry. It is safe to assert that on long lines of railway, trains are constantly moving towards public crossings where travelers must pass over the track, and, if business is to be transacted, they must necessarily cross in front of an advancing engine. It is the imminent danger incident to the near approach of a train that prohibits a person from attempting to cross the track in front of it. "The authorities," says Mr. Chief Justice ELLIOTT, in *Korrady* v. *Lake Shore Ry. Co.* 131 Ind. 261 (29 N. E. 1069), "are decisively against the right of recovery by one who voluntarily attempts to cross a track in front of a moving train which he sees not far distant approaching the crossing." Hearing the whistle of a locomotive, while

not affording the same degree of information which seeing an engine furnishes, must necessarily be all the announcement that can reasonably be made where an extended view of the track cannot be obtained. If such a warning is given at the proper place, a railway company has done all that prudence demands to warn travelers of the danger of attempting to cross in front of a train. Where a view of a railway track is obscured, there is, of course, a point so near a public crossing that, if a signal were given at that place, it would not afford adequate notice of the near approach of a train, and there is also a place so remote from the crossing that, if a whistle were sounded at such locality, it would not give the information which a blast from the engine was designed to supply. We have no statute regulating these matters, and hence the minimum or maximum distance from a public crossing between which points a warning of the approach of a train should be given, is not prescribed. The testimony does not affirmatively show that the whistle was sounded at the post set 1,500 feet southeasterly from the Sandy Road crossing, and, in the absence of any statute on the subject, the question whether or not the notice of the approach of the train was reasonable, under the circumstances of this case, was for the jury to determine: Elliott, Railroads (2 ed.), § 1158.

13. Complaint is made because in the opinion the word "supposed" is used; the defendant's counsel asserting that judgments should rest upon facts duly found, and not on conjectures. The word mentioned was used out of an abundance of caution in view of the conclusion reached to grant a new trial. Whether or not the engineer saw the team on the track, as intimated, was not disclosed by the testimony, and for that reason the word "supposed" was advisedly used.

Believing that the former opinion correctly states the law applicable to the facts involved, the petition for a rehearing is denied.

REHEARING DENIED: REVERSED.