Argued October 14, reversed November 10, 1914, sustained on rehearing February 2, 1915.

## LONG v. PACIFIC RY. & NAV. CO.*
(144 Pac. 462; 145 Pac. 1068.)

Railroads—Injuries to Persons on Track—Contributory Negligence.

1. Where, after a freight train had passed, a person crossed the railroad track and proceeded on a plank walk parallel to the track to the end thereof, and then without looking back stepped upon the track immediately in front of a work train, which he could have seen, had he glanced in its direction, he was guilty of contributory negligence as a matter of law, and there could be no recovery for his death.

[As to duty of traveler on highway to use his senses of sight and hearing to avoid dangers at crossings, see notes in 90 Am. Dec. 780; Ann. Cas. 1914A, 536.]

ON REHEARING.

Railroads—Liability for Injuries to Licensee.

2. Where the use of a railroad right of way as a walkway for foot travel had not continued long enough for the public to acquire a right' by prescription to use the right of way for that purpose, a person so using it was a bare licensee, to whom the company owed no duty beyond that of abstaining from willful injury.

———

*Upon the question of the duty to maintain lookout for persons on track, generally, see note in 25 L. R. A. 287 and 8 L. R. A. (N. S.) 1069.

As to the duty of railroad company toward trespassers or persons on track, see note in 36 L. Ed. (U. S.) 1064.

For the doctrine of last clear chance, in case of undiscovered persons on track, see notes in 55 L. R. A. 418, 424 and 36 L. R. A. (N. S.) 957.

Reporter.

Railroads—Liability for Injuries—Last Clear Chance.

3. The last clear chance doctrine applies only to a perceived peril, and could not be invoked on behalf of a licensee, where it was sought to base a right to recover on the failure to keep a proper lookout, and not on the failure to warn him or to stop the train after those in charge of the train saw him, especially where it did not appear that it was possible to stop the train within the short intervening distance, had his presence been observed.

From Tillamook: WILLIAM GALLOWAY, Judge.

Department 1.   Statement by MR. JUSTICE MOORE.

This is an action by Frank Long, Sr., as administrator of the estate of William Campbell, deceased, against the Pacific Railway & Navigation Company, a corporation, to recover damages for the death of the deceased, which is alleged to have been caused by the defendant's negligence.   From a judgment for plaintiff in the sum of $2,000, defendant appeals.

REVERSED, AND ACTION DISMISSED.

SUSTAINED ON REHEARING.

For appellant there was a brief over the names of *Mr. John F. Reilly, Mr. William D. Fenton, Mr. Ralph E. Moody* and *Mr. Webster Holmes,* with an oral argument by *Mr. Reilly.*

For respondent there was a brief over the names of *Mr. Ralph R. Duniway* and *Mr. Sidney S. Johnson,* with an oral argument by *Mr. Duniway.*

MR. JUSTICE MOORE delivered the opinion of the court.

1. It is maintained that the testimony shows the deceased was guilty of negligence, contributing to his injury, and, this being so, errors were committed in denying a motion for a judgment of nonsuit and in refusing to direct a verdict for the defendant.   The

defendant operates from Portland to Tillamook, in this state, a railroad, a part of which is built along the south shore of Nehalem Bay, where the line is constructed through Vosburg, or Wheeler, and a little east thereof, through New Wheeler. A landslide having occurred west of Wheeler, the defendant on November 4, 1912, was engaged in hauling the debris that had fallen near its track and dumping same near New Wheeler. The train used for that purpose was known as "Extra No. 1," and consisted of three flat cars, a passenger coach, used as a caboose, and a locomotive, with a tender. When loaded, the trian was run backward; the position of the cars and engine being in the order stated. On the day mentioned extra No. 1, loaded with mud, sand and gravel, was run upon a spur near a sawmill at Wheeler, in order to permit freight train No. 2500 to pass, going east. As soon as the rear end of that train crossed the line of the switch connecting the mill slip, extra No. 1 came out and began backing east on the main line, only a few hundred feet behind the freight train. William Campbell who had been standing near the mill office, crossed the track to the south as soon as train No. 2500 passed. He then went east on a plank walk a short distance to the end thereof, when, without looking back, he stepped upon the track in front of extra No. 1, and, having taken 4 or 5 paces, was hit by the car, knocked down and injured, from the effects of which he died. Jay Houser, who was 14 years old, appearing as plaintiff's witness and referring to William Campbell as of the time of the accident, testified as follows:

"He started up above [referring to the location of the sawmill], and got to the end of the walk, and the 2500· had just passed, and he stepped in behind it, and

he stepped off the walk, and there was another train (extra No. 1), with a couple of flat cars—two or three; I don't know for sure how many, but there were either two or three—and they were going by, and they had mud in them, and he stepped in behind the 2500 and went walking right up the platform, and when he got to the end he stepped off of the platform into the track; and I hallooed at him and whistled at him to get off the track, and he didn't hear me, I guess, and he just walked two or three steps, and the train hit him, and it struck him right about in the back.''

On cross-examination this witness testified as follows:

''Q. Now, when he [Campbell] came along this board walk, did he look back any time?

''A. No, sir; he went on when that train was gone down there.

''Q. What train?

''A. The 2500.

''Q. Where was he when they came through?

''A. Right about in here (referring to a photograph).

''Q. That is, he was standing clear over at the saw-mill?

''A. Yes, sir. * *

''Q. Then he came from there onto this board platform, which parallels the railroad track?

''A. He walked on that board walk right down by it. * *

''Q. And he walked clear the whole length of that, did he?

''A. Yes, sir. * *

''Q. During the time he was walking along that board walk there he was clear of the railroad track?

''A. Yes, sir.

''Q. He was where the train wouldn't hit him, wasn't he?

''A. He was where it wouldn't hit him, if he walked over farther.

"Q. If he walked along the walk, the way he was going, the engine or none of the train would have hit him; isn't that so?

"A. Yes; but if he had kept on he would have walked into a ditch.

"Q. After he came to the end of the walk?

"A. Yes. * *

"Q. He didn't look back at any time?

"A. No. * *

"Q. Did he look back any time he was walking on the track?

"A. Well, I was right over on the platform there by the cook-house, and I hallooed at him, and he looked at me; never looked back, though. I told him to come in and have supper.

"Q. That was when he was on the board walk?

"A. Yes.

"Q. I mean after he got on the track?

"A. No, * *

"Q. How far was the train from him when he stepped on to the track—the train that hit him?

"A. I couldn't say. * *

"Q. Just about the length of the room (referring to the courtroom)?

"A. Just about.

"Q. That is, he was just about that far ahead of the train when he stepped on to the track in front of it?

"A. Yes, sir; maybe not that far. (The room referred to was thereupon measured, and found to be 49 feet in length.) * *

"Q. Now, when you saw him step on the track, you hallooed at him; is that right?

"A. Yes.

"Q. What did you halloo at him?

"A. I just told him to get off the track.

"Q. Did you halloo very loud at him?

"A. Well, as loud—I don't know how loud I hallooed. I hallooed loud enough for he ought to have heard. He could have heard, if it hadn't been storming, I know.

"Q. How far were you from him, about?

"A. I don't know.

"Q. How far were you—say how would it compare with the length of the courtroom here?

"A. It is farther; * * well, it is about twice as far, I guess."

The deposition of Mabel Tillotson is to the effect that she saw the accident; that the train causing the injury was moving with extraordinary speed; that she saw no person in charge or control of the cars, nor did she hear any signals given. A part of her sworn statement is as follows:

"Q. Do you think you could have heard a bell ringing from your position?

"A. I am sure I could, because I heard the bell and whistle from the train that had just passed (No. 2500). I was standing in the same place.

"Q. You speak of the train that had just passed. Explain what you mean.

"A. I was speaking of the other train, that just passed a little in advance of this one. They were whistling and ringing the bell for a man to get off the trestle.

"Q. At the time of the accident?

"A. While they were making all this noise, the other train came along and struck this man.

"Q. About how far was the train that was whistling ahead of the train that struck Campbell?

"A. Do you mean how far between the trains?

"Q. Yes.

"A. About three or four car-lengths, I should say.

"Q. About how long had it passed the point where Campbell was struck, before he was struck by the other train?

"A. I wouldn't be sure, but just a little while."

The plaintiff introduced testimony tending to show that a trail had been cut through the brush from Wheeler to New Wheeler, but that most pedestrians from one of these places to the other passed along the

railroad, although in doing so it was necessary to walk along a trestle.

The foregoing is thought to be the important parts of the testimony received when the motion for a nonsuit was interposed.

Thereafter W. H. Frink, as defendant's witness, testified that at the time of the accident he was employed as a brakeman and stood on the leading car, about 15 feet from the forward end as it was backed east; that after the freight train passed the mill slip he gave a back-up signal, to which the engineer responded with three short blasts of the whistle, and after reaching the main line a crossing whistle was also given; that when the witness first saw Campbell he was about two car-lengths ahead, going east on the platform, and reaching the end thereof he stepped to the earth and took about three paces, when, without looking back, he sprang on the track about 15 feet ahead of the work train. Upon this subject the witness testified as follows:

"Q. What did you do, if anything, when you saw him jump on the track in front of the car?

"A. I hallooed at him when he stepped off the end of the plank walk there, and he didn't seem to pay any attention to me, and when he stepped on the track I hallooed and whistled and everything else, everything in my power, to get him off the track, and gave violent stop signals to the engineer."

This witness further testified that he shouted at the top of his voice: "Hey!" "Hey there!!" "Look out!!!" and Campbell did not seem to pay any attention. He further stated upon oath that when the accident occurred the rate of speed of the train did not exceed six miles an hour, and that Campbell could have had a clear and unobstructed view of the cars as they

approached, if he had looked in that direction. On cross-examination this witness was asked if on November 4, 1912, at a particular place and in the presence of designated persons, a Mr. Austin did not say to him, ''I don't see how you could run over a man without seeing him,'' and he replied, ''Mr. Austin, nobody saw him; the first I saw of him was when he was thrown under the wheels,'' and Mr. Austin remarked, ''That's funny,'' and did he not at the same time and place hear another member of his train crew say to Austin, '' 'You know we had been on duty a certain number of hours overtime without relief' and didn't you agree with that statement?'' The witness replied, ''No, sir; I didn't.'' Frink also testified that at the time of the accident the steam was shut off and the train drifting, thereby making but little noise, and that it was raining, and a light wind blowing. This witness further stated that a rule of the defendant required trains running in the same direction to keep ten minutes apart, except in closing up at stations.

A. M. Austin, the person mentioned in laying a foundation for the impeaching question, in answer thereto, referring to the preceding witness and to Campbell, testified as follows:

''He said the first he saw of him he was thrown from under the train. I said, 'If you were standing on the car, I don't see how you could run over him without seeing him.' He said, 'The first we saw of him'— He said, 'It was storming and they were in the coach,' and I said, 'If you were standing on that car you could have certainly seen the man,' and I asked him how it happened that he could do that, and he said the first he seen of the man was when he came from under the car.''

The testimony also shows that, in violation of the rules of the defendant, a young woman was riding in the cab of the engine at the time of the accident.

A. C. Alexander, a locomotive engineer, who, as such, had charge of the engine pulling the freight train which preceded extra No. 1 on the day of the accident, testified as defendant's witness that, though trains running between stations were required to keep 10 minutes apart, such rule did not apply in yards, and that the yard limits where Campbell was hurt, and which boundaries had been established since the injury, extended from about a quarter of a mile west of Wheeler to a quarter of a mile east of New Wheeler.

In referring to the accident, W. H. Frink was asked, "Were you working under special orders at that time?" He replied:

"We were working under train orders. Train orders exceed everything else. * *

"Q. When working under train orders on a work train in the same limits as another work train, are you bound by the printed rule to keep ten minutes apart—or behind or in front of the other work train?

"A. No."

This witness further stated:

"Well, the facts are, if you get a train order to work between two limits, and you get a message to work in this one gravel pit, and another train, say the 2500, will get instructions to work in there also, the two trains will work in that gravel pit, and they don't necessarily have to keep ten minutes apart, either, at no time, between no two points, to protect against each other. * *

"Q. What train order did you receive here on November 4, 1912?

"A. I received a train order, a work extra train order, to work between two set points."

He further stated upon oath that train orders were always read by the brakemen.

The testimony hereinbefore quoted and referred to is considered to be a sufficient statement of the facts and circumstances relating to the injury from which to determine whether or not errors were committed as alleged.

Assuming as true the testimony given by the plaintiff's witnesses, and giving to it every presumption and inference that can be legitimately deduced therefrom, it would seem that William Campbell, on the day he was hurt, must have thought, when train No. 2500 crossed the walk leading to the sawmill, on which passageway he was standing, that no other train would immediately follow; that, relying on such belief, he crossed the track to the south and proceeded east on the plank walk to the end thereof; that the day being stormy, and extra No. 1 coasting toward him, he did not hear it approach, nor the warning given by Jay Houser; that, supposing the track was clear, Campbell without looking back stepped upon the track immediately in front of the car; and that he could have seen the train if he had glanced in that direction. "The fact that one train has passed," says a noted author in referring to the duty of a person about to cross a railroad track, "is not such an assurance of safety as authorizes the traveler to make the attempt to cross without carefully looking and listening for other trains": 3 Elliott, Railroads (2 ed.), § 1166. To the same effect, see, also, *Durbin* v. *Oregon R. & N. Co.*, 17 Or. 5 (17 Pac. 5, 11 Am. St. Rep. 778). The failure of a competent person about to cross a railroad track to look and listen for an approaching train is negligence *per se*, and will bar a recovery for an injury received by a collision with the engine or cars at the

crossing: *McBride* v. *Northern P. R. R. Co.,* 19 Or. 64 (23 Pac. 814); *Blackburn* v. *Southern Pacific Co.,* 34 Or. 215 (55 Pac. 225); *Hecker* v. *Oregon R. R. Co.,* 40 Or. 6 (66 Pac. 270); *Kunz* v. *Oregon R. & N. Co.,* 51 Or. 191 (93 Pac. 141, 94 Pac. 504).

In *Exum* v. *Atlantic Coast Line R. Co.,* 154 N. C. 408 (70 S. E. 845, 33 L. R. A. (N. S.) 169), it was held that a person walking upon a railroad track was negligent in not using all his faculties to look out for trains, the rule applying to persons on the track with greater force than to those merely crossing, and that the duty of one on a railroad track to look out for trains is the same, whether he is a licensee or a trespasser, as the license to use does not carry with it the right to obstruct the road and impede the passage of trains.

In *Byrnes* v. *New York etc. R. Co.,* 195 Mass. 437 (81 N. E. 187), a person was walking along by the side of a track in a railroad yard, and an engine was approaching on that track in the same direction. Having walked a short distance by the side of the track, he started to cross it diagonally, directly in front of the engine, with his back toward it, and without looking behind him or taking any notice of its approach. The engine ran over and killed him, and it was ruled that he was guilty of contributory negligence, and not relieved of duty to use reasonable care for his own safety by the fact that the engineer in charge of the engine was negligent in failing to. ring the bell and keep a proper lookout.

In *Bush* v. *Union Pacific R. Co.,* 62 Kan. 709 (64 Pac. 624), it was determined that one attempting to cross a railroad track on a public highway, who was familiar with and relied upon a rule of the company which prohibited trains from following one another within ten minutes, was guilty of contributory negli-

gence in going upon the track without looking and
listening for an approaching train, and that such rule
was applicable, though the engine and cars causing the
injury constituted a "wild train," and followed the
preceding one within one or two minutes.

From the rules thus clearly established, it is manifest that in attempting to walk along the railroad track
without looking back to see if a train was approaching
William Campbell was guilty of negligence as a matter
of law, precluding a recovery of any damages herein,
and, such being the case, errors were committed in
failing to grant a judgment of nonsuit and in refusing
to direct a verdict for the defendant.

It follows that the judgment is reversed and the action dismissed.

REVERSED AND DISMISSED.<br>
SUSTAINED ON REHEARING.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE BURNETT
and MR. JUSTICE RAMSEY concur.

---

Former opinion sustained February 2, 1915.

ON REHEARING.

(145 Pac. 1068.)

Department 1.    MR. JUSTICE MCBRIDE delivered the
opinion of the court.

On re-examination of this case upon the petition for
rehearing, we are still of the opinion that the facts
are as stated by Mr. Justice MOORE, and that his conclusions therefrom are fully justified. Plaintiff's evidence tended to show that the gravel train which

caused the injury was backing down the track at the probable rate of from 15 to 20 miles an hour, and it may be assumed, for the purposes of this case, that this speed was greater than prudence allowed in passing the mill and other buildings constituting the little community where the deceased resided. It may also be conceded that plaintiff's contention that no sufficient lookout was maintained to discover persons walking upon the track is true, but the fact remains that deceased stepped suddenly in front of the moving train when it was approximately only 49 feet distant, and had taken three or four steps along the track with his back toward the train when he was struck and killed. It is idle to say that he had no warning of the danger of his situation. A railroad track is always a place of danger. Every rail and every tie is shouting danger, and it is the duty of a person to look if he is in a situation to look, and to listen if he is in a situation to listen. A single glance down the track would have warned deceased of the impending danger, even if the winds prevailing might have prevented his hearing the approach of the train. Unfortunately he was heedless and failed to exercise any precaution for his own safety. It is fully demonstrated in the original opinion that deceased was not excused from the duty of taking these precautions by the fact that another train had just passed going in the same direction as the one which struck him, and further discussion of that subject is unnecessary.

2, 3. The contributory negligence of deceased is so clearly established by plaintiff's own evidence as to be beyond question; and, unless the doctrine of the "last clear chance" can be invoked here, there was nothing to submit to the jury, and it was the duty of the court to have granted a nonsuit. The evidence for plaintiff

in the case at bar shows that the right of way of the defendant was used by residents of that vicinity as a walkway for foot travel. How long this use had prevailed does not appear. Certainly it had not been continued long enough for the public to acquire a right by prescription to use the right of way for that purpose. It is a matter of common knowledge that such rights of way and the tracks are commonly used by foot-passengers wherever they are more convenient than the ways constructed by public authorities. It goes without saying that such use is not desired or encouraged by the railway authorities, but merely suffered because of the difficulties of preventing it. Such use is never of any advantage to the transportation companies, but is a disadvantage and freqently a source of danger and annoyance; and at best, under the testimony, the deceased was a bare licensee to whom the company owed no duty beyond that of abstaining from any willful injury: *Watson* v. *Manitou & Pike's Peak Ry. Co.*, 41 Colo. 138 (92 Pac. 17, 17 L. R. A. (N. S.) 916); *Montague* v. *Hanson,* 38 Mont. 376 (99 Pac. 1063); *Beehler* v. *Daniels,* 18 R. I. 563 (29 Atl. 6, 49 Am. St. Rep. 790, 27 L. R. A. 512); *Schreiner* v. *Great N. Ry. Co.,* 86 Minn. 245 (90 N. W. 400, 58 L. R. A. 75). The doctrine of the ''last clear chance'' cannot be invoked on behalf of plaintiff. This doctrine applies only to a perceived peril. It is remarked by Mr. Justice Bean in the case of *Smith* v. *Southern Pac. Co.,* 58 Or. 22 (113 Pac. 41, Ann. Cas. 1913A, 434):

''Where plaintiff negligently assumed a position of danger in such a degree, and so contributed to his hurt as to leave him without right of recovery for any primary negligence of the other party, he may nevertheless recover, if the person charged with the wrong or injury became aware of the peril in time to avoid,

by the proper use of all the means at his command, injuring him, and listlessly and inadvertently or negligently failed to resort to such means: *Stewart* v. *P. R. L. & P. Co.*, 58 Or. 377 (114 Pac. 936); *Scholl* v. *Belcher*, 63 Or. 310 (127 Pac. 968); *Rowe* v. *So. Cal. Ry.*, 4 Cal. App. 1 (87 Pac. 220); *Herbert* v. *Southern Pacific Co.*, 121 Cal. 227 (53 Pac. 651); *Harrington* v. *Los Angeles Ry. Co.*, 140 Cal. 514 (74 Pac. 15, 98 Am. St. Rep. 85, 63 L. R. A. 238); *Black* v. *New York Ry. Co.*, 193 Mass. 448 (79 N. E. 797, 9 Ann. Cas. 485, 7 L. R. A. (N. S.) 148).

The case at bar is based upon the assumption, not that defendant saw deceased and negligently failed to warn him or stop the train, but rather that the persons in charge of the train negligently failed to keep a proper lookout and ran over deceased without discovering him; and there is no evidence indicating that it was possible for defendant to have stopped its train within the 49 feet that intervened between it and deceased, when he suddenly appeared on the track, even if his presence there had been observed. While the accident was deplorable in its consequences, we cannot avoid the conclusion that the negligence of deceased contributed to it to such an extent as to bar a recovery.

We adhere to the original opinion.

SUSTAINED ON REHEARING.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE BURNETT and MR. JUSTICE BENSON concur.