NEARY ET AL., RESPONDENTS, *v.* NORTHERN PACIFIC RAILWAY CO. ET AL., APPELLANTS.

(No. 2,851.)

(Submitted June 22, 1910. Decided July 6, 1910.)

[110 Pac. 226.]

*Personal Injuries—Railroads—Cities and Towns—Speed of Trains—Ordinances—Validity—Pleadings—Theory of Case—Complaint—Wanton Negligence—Surplusage—Law of the Case — Instructions — Licenses — Contributory Negligence — Proximate Cause—Excessive Verdict—Cost Bill—Amendments.*

Personal Injuries—Railroads—Cities and Towns—Speed of Trains—Ordinances—Validity—Pleading.
1. To enable the defendant railroad company to show that an ordinance regulating the speed at which trains could be run within the city limits was void, because unreasonable, when applied to that portion of its yards where the accident occurred which gave rise to a personal injury action, it should have pleaded the facts upon which such claim was based.

Same—Theory of Case—Review.
2. Respondent cannot be said to have acquiesced in the trial of a cause upon the theory that it included an issue not made by the pleadings, by permitting evidence to be received without objection, where the purpose of offering the evidence was not explained at the time, and where it was apparently material and competent as bearing upon issues other than the one not raised by the pleadings.

Same—Law of the Case—What Constitutes.
3. Where upon a former appeal in a personal injury case it was held that under the evidence the cause should have been submitted to the jury, and that the court erred in directing a verdict for defendant, and upon the second trial the testimony was substantially the same as that adduced at the first, the former decision was the law of the case, and the court properly followed the court's direction in this respect.

Same—Complaint—Wanton Negligence—Surplusage.
4. *Held,* that under an allegation in the complaint that defendant acted so "wantonly and grossly carelessly and negligently" in the running of one of its trains as to cause the death of plaintiffs' intestate, a recovery may be had upon proof of ordinary negligence only, the adverbs "wantonly" and "grossly" being treated as surplusage.

Same—Instructions—Law of the Case.
5. Since a decision of the supreme court, whether right or wrong, is the law of the case on a second trial, an instruction couched in language substantially the same as that used by that court in dis-

posing of one of appellant's contentions was properly given on the retrial.

**Same—Licensee—Evidence—Insufficiency.**

6.   Evidence *held* to show an agreement between defendant railroad company and a connecting line, under which the employees of the latter could use the tracks of the former in making up and operating trains, and that therefore deceased, a freight train conductor in the employ of the latter company, who was killed while engaged in checking his train standing on defendant's tracks, was not a mere licensee to whom defendant did not owe the duty of keeping an active lookout for his presence on the tracks.

**Same—Operation of Trains—Care Required.**

7.   Though, generally speaking, no duty rests upon a locomotive engineer to stop his train whenever he sees a person on the track, but he may presume in the first instance that such person will heed the usual warning signals and take a place of safety, yet where an engineer saw decedent on the track, apparently so engrossed in his duties as to pay no attention to signals, and, upon sounding the whistle when 600 feet away, ran over 450 feet after applying the emergency brake, though he could have stopped within 300 feet, the question whether under all the facts and circumstances he was justified in acting upon the presumption above referred to, was one for the jury, and a charge that under the circumstances of this case it was the duty of the engineer to use reasonable care to discover decedent's peril was proper.

**Same—Contributory Negligence—Proximate Cause.**

8.   The contributory negligence of a plaintiff or deceased person which will operate to defeat a recovery must have been such as directly contributed to the injury at the time it was inflicted; his negligence must have been a proximate cause of the injury.

**Same—Excessive Speed of Trains in Cities—Negligence *Per Se.***

9.   The running of a railroad train in a city in excess of the rate of speed fixed by ordinance is negligence *per se*, and where this lapse of duty directly contributes to an injury, liability attaches to the person responsible therefor.

**Same—Cities and Towns—Excessive Speed of Trains—Proximate Cause of Injury.**

10.   Where owing to the excessive rate of speed at which a train was run within the city limits, contrary to the provisions of an ordinance, both before and after discovery of the peril of deceased, a freight conductor who was so absorbed in checking his train as not to notice the approach of the train on the track on which he was standing, the locomotive engineer was unable to stop so as to avoid the accident, the inability of the engineer to bring the train to a stop because of the violation of the ordinance, and not the contributory negligence of deceased in placing himself in a situation of danger, *held*, to have been the proximate cause of the accident.

**Same—Duty of Railway Engineer Approaching City Limits.**

11.   An engineer in charge of a railway locomotive who, on approaching the limits of a city or town at a speed prohibited by ordinance, observes a person upon the tracks over which he is about to pass, must instantly reduce his speed to the ordinance limit, and may not rely upon the presumption that such person will upon signal assume a place of safety.

Same—Excessive Verdict—What Does not Constitute.

12. A verdict of $25,000 as damages for the negligent killing of a freight train conductor, whose expectancy of life was twenty-nine years, and whose monthly earnings had been $150, *held* not excessive. Where a verdict, claimed to be excessive, is capable of being arrived at by mathematical calculation, the elements of passion and prejudice will not be presumed to have influenced the minds of the jurors.

Cost Bill—Amendment—Refusal—When Abuse of Discretion.

13. Under section 6589, Revised Codes, granting it power to allow amendments, the district court abused its discretion in refusing to permit an amended memorandum of costs to be filed, in which not any new items were sought to be added to the original, but the sole purpose of which was to furnish the objecting party with information relative to alleged expenditures, the absence of which from the original was claimed to be prejudicial. A showing of inadvertence, surprise or excusable neglect was not necessary in order to warrant the allowance of the amendment.

Same—Cost Bill—Amendment, When Considered as Made.

14. Where the district court abused its discretion in refusing an amendment to a cost bill to be filed, the supreme court on appeal will treat it as if it had been filed.

*Appeal from District Court, Yellowstone County; Sydney Fox, Judge.*

ACTION by Marie Neary, widow and heir at law of James S. Neary, deceased, and others, minors and heirs at law of the deceased, by their guardian *ad litem,* Marie Neary, against the Northern Pacific Railway Company and another. From a judgment for plaintiffs, defendants appeal. Affirmed.

*Mr. Wm. Wallace, Jr., Mr. John G. Brown,* and *Mr. R. F. Gaines* submitted a brief in behalf of Appellants. *Mr. Wallace* argued the cause orally.

The gravamen of respondents' case was the wanton action of defendants resulting in the death of Neary. Having elected to recover upon this state of facts, the proof must support the allegations of wantonness. (*Robinson* v. *Helena L. & Ry. Co.,* 38 Mont. 242, 99 Pac. 837; *Cleveland etc. Ry.* v. *Ricker,* 116 Ill. App. 428; *Montgomery etc. Ry.* v. *Rice,* 142 Ala. 674, 38 South. 857.) Having averred that the defendants acted grossly wantonly in the premises, proof of any lesser degree of negligence would not support a verdict. (*Turtenwald* v. *Ice Co.,* 121 Wis. 65, 98 N. W. 948; *Wilson* v. *Chippewa etc. Ry. Co.,* 120 Wis.

636, 98 N. W. 536, 66 L. R. A. 912; *Levin* v. *Railway,* 109 Ala. 332, 19 South. 395; *Railway* v. *Crocker,* 95 Ala. 412, 11 South. 262; *Louisville etc. Ry.* v. *Hurt,* 101 Ala. 34, 13 South. 130, and *Highland Ave. etc. Ry.* v. *Winn,* 93 Ala. 306, 9 South. 509; *Indiana etc. Ry. Co.* v. *Overton,* 117 Ind. 253, 20 N. E. 148; *Louisville etc. Ry.* v. *Bryan,* 107 Ind. 51, 7 N. E. 807; *Chicago etc. Ry.* v. *Dickson,* 88 Ill. 431; 29 Cyc. 588.)

The court erred in refusing to give defendants' offered instruction No. 8, by which instruction the defendants requested that the doctrine of the last clear chance of averting the accident, in this instance, be limited to the possibility of so doing after actual discovery, as distinguished from possibility of discovery. The defendants could only be held liable for their wanton failure to avoid the accident after Neary's presence and peril were shown to have been actually known by them. (See *Keefe* v. *Chicago etc. Ry. Co.,* 92 Iowa, 182, 54 Am. St. Rep. 542, 60 N. W. 504; *Louisville etc. Ry.* v. *Young,* 53 Ala. 252, 45 South. 238, 16 L. R. A., n. s., 301; *Barry* v. *Railway,* 77 Ark. 401, 91 S. W. 748; *Ruppel* v. *Railway,* 10 Cal. App. 319, 101 Pac. 803–805; *Denver etc. Ry.* v. *Dwyer,* 20 Colo. 132, 36 Pac. 1106; *Tully* v. *Railway,* 2 Penne. (Del.) 537, 82 Am. St. Rep. 425, 47 Atl. 1019; *Freitag* v. *Railway* (Ind. App.), 89 N. E. 501; *Pierce* v. *Walters,* 164 Ill. 560, 45 N. E. 1068; *Jones* v. *Railway,* 121 Ala. 39, 46 South. 61–64; *Tennis* v. *Railway,* 45 Kan. 503, 25 Pac. 876; *Bouwmeester* v. *Railway,* 63 Mich. 557, 30 N. W. 337; *Atwood* v. *Railway,* 91 Me. 399, 40 Atl. 67; *Erickson* v. *Railway,* 41 Minn. 500, 43 N. W. 332, 5 L. R. A. 786; *Morehead* v. *Railway,* 84 Miss. 112, 36 South. 151; *Camden etc. Ry.* v. *Young,* 60 N. J. L. 193, 37 Atl. 1013; *Sweeney* v. *New York Steam Co.,* 117 N. Y. 642, 22 N. E. 1131, affirming 6 N. Y. Supp. 528; *Louisiana etc. Ry.* v. *McDonald* (Tex. Civ. App.), 52 S. W. 649; *Eastburn* v. *Railway,* 34 W. Va. 681, 12 S. E. 819; *Valin* v. *Railway,* 82 Wis. 1, 33 Am. St. Rep. 17, 51 N. W. 1084.)

The question of the validity of ordinances, such as the one involved here, where there is no dispute in the evidence as to facts, is one for the court. (33 Cyc. 668, cases noted; 2 Elliott on Rail-

roads, sec. 670; *Evison* v. *Chicago etc. Ry.*, 45 Minn. 370, 48 N. W. 6, 11 L. R. A. 437; *Lakeview* v. *Tate*, 130 Ill. 247, 22 N. E. 791, 6 L. R. A. 268; *Meyers* v. *Railway*, 57 Iowa, 555, 42 Am. Rep. 50, 10 N. W. 897.)

In behalf of Respondents there was a brief by *Messrs. Walsh & Nolan* and *Mr. E. E. Enterline. Mr. T. J. Walsh* and *Mr. Enterline* argued the cause orally.

If the appellants intended to insist that at the particular place at which the deceased was killed the ordinance was, for any reason, inoperative, they should have set out in their answer the facts and conditions which make it so. (See *Kunz* v. *Oregon R. & N. Co.*, 51 Or. 191, 93 Pac. 141, 94 Pac. 504; *Gratiot* v. *Missouri P. Ry. Co.* (Mo.), 16 S. W. 384, 19 S. W. 31, 21 S. W. 1094, 16 L. R. A. 189.) The rule of the law of the case forbids any inquiry into the question of the validity of the ordinance. Questions which were once determined or conceded on the hearing in an appellate court will not be considered on a second appeal or writ of error. (*Roth* v. *Mutual Reserve L. I. Co.*, 162 Fed. 282.) The rule of the law of the case extends not only to all points of the controversy touched upon in the opinion, but to all questions raised by the record and necessarily involved in the decision. (*Oldig* v. *Fisk*, 1 Neb. (Unof.) 124, 95 N. W. 492; *Scottish American Mtg. Co.* v. *Reeve*, 7 N. D. 552, 75 N. W. 910; *Wastl* v. *Montana U. Ry. Co.*, 24 Mont. 159, 61 Pac. 9.) On a demurrer to evidence, the ruling of the court on appeal extends to every question which could have been raised when the cause was first submitted to the public tribunal. (*Dunn* v. *Nicholson*, 125 Mo. App. 725, 103 S. W. 114.)

Wherever, in the exercise of reasonable care and diligence, an engineer, charged with the operation of a contrivance as deadly as a moving locomotive, ought to have discovered the peril of some one on the track ahead of him, apparently oblivious of his danger, a recovery may be had, though a want of due care might be charged against the person imperiled. This court not only so declared on the former appeal, but it asserted the like rule in

*Riley* v. *Northern Pac. Ry. Co.*, 36 Mont. 545, 93 Pac. 948, and thereby put itself in harmony with the more modern and best considered cases, such as *Nichols* v. *Chicago etc. Ry. Co.*, 44 Colo. 501, 98 Pac. 808; *Trigg* v. *Water, Light & Transit Co.*, 215 Mo. 521, 114 S. W. 972, 20 L. R. A., n. s., 987, and *Philadelphia & R. R. Co.* v. *Klutt*, 148 Fed. 818, 78 C. C. A. 508.

MR. JUSTICE SMITH delivered the opinion of the court.

This is the second appeal of this case. (*Neary* v. *Northern Pacific Ry. Co.*, 37 Mont. 461, 97 Pac. 944, 19 L. R. A., n. s., 446.) Upon the first trial the district court of Yellowstone county directed a verdict for the defendants, and judgment in their favor was entered accordingly. This court reversed the judgment, and remanded the cause for a new trial. It was held (1) that the deceased, Neary, was guilty of contributory negligence, and (2) that the cause should have been submitted to the jury upon the question of the defendants' negligence in failing to use reasonable care to avail themselves of the last clear opportunity to avoid the catastrophe. The second trial resulted in a verdict for the plaintiffs in the sum of $25,000 damages. From a judgment entered thereon and an order denying a new trial, the defendants have appealed.

The main facts in the case are fully set forth in the former opinion of the court, prepared by the chief justice. As to the statement therein contained it is now said by counsel for the appellants, in their brief: "As the statement of facts so fully set forth in the court's opinion will be sufficient for practically all the purposes of a statement in this brief, we will herein adopt that statement, with three exceptions: (1) The first of these exceptions is the apparent assumption, as an established fact, that Neary was upon the tracks of the defendant railway company in the discharge of his duties and with the express consent of the railway company. We claim that it can neither be assumed nor found as a fact that the employees of the C., B. & Q. Railway Company used the tracks and switches of the defendant company's yards, by agreement, as charged in the complaint,

that the said employees in so using the yards frequently walked across and along the tracks, and that the railway company and its servants had 'full knowledge and notice of said fact.' (2) The statement of facts in the decision contains the following language: 'The yards extend through the central portion of the city, and for most of the distance—several thousand feet—lie within the city limits.' As far as it goes, this statement is correct; but upon the second trial it was established in addition that the yards of the company were inclosed with fences, from practically Twenty-ninth street (the first street east of where the accident happened) to a point about 6,680 feet west thereof, and that in this distance there is not a single street crossing of any kind through the yards. Also, that the west limits of the city were several thousand feet east of the public road crossing at the point 6,680 feet west of Twenty-ninth street. (3) The third exception is that considerably more evidence was introduced bearing upon the question of the ability of the engineer to have stopped his train after he discovered that Neary was not conscious of his approach, which, while conflicting, would not warrant a finding that the engineer was 'wantonly and grossly' negligent in his actions."

1. At the second trial the ordinance of the city of Billings declaring it to be unlawful to move trains within the city limits at a rate of speed exceeding six miles per hour was offered in evidence and objected to by defendants' counsel on the ground "that the ordinance is unreasonable and not within the power of the city council, as applied to the defendants in these yards, for the reason that there is no open crossing on said tracks for approximately 2,000 feet, used by the public eastward of this accident, and approximately 4,250 feet or three-quarters of a mile westward. The yards were inclosed by a fence, and were the private yards of the company, not used by the public. The only tendency of the evidence would be to prove primary negligence and that would be immaterial in this case." The court overruled the objection.

The first point urged is fully explained by the phraseology of the objection itself, and will be considered at this time. The

second will be taken up hereafter when we come to consider the effect of the contributory negligence of which it has been held the deceased was guilty. It is earnestly contended that the ordinance, in view of the additional facts brought out at the second trial, is unreasonable, inoperative, and void in so far as it is sought to apply the same to the place where Neary was killed, and the following cases are cited in support of the contention: *Evison* v. *C., St. P. etc. Ry. Co.,* 45 Minn. 370, 48 N. W. 6, 11 L. R. A. 434; *Burg* v. *Chicago etc. R. Co.,* 90 Iowa, 106, 48 Am. St. Rep. 419, 57 N. W. 680; *Meyers* v. *Chicago, R. I. & P. R. Co.,* 57 Iowa, 555, 42 Am. Rep. 50, 10 N. W. 896; *City of Plattsburg* v. *Hagenbush,* 98 Mo. App. 669, 73 S. W. 725; *Southern Indiana Ry. Co.* v. *City of Bedford,* 165 Ind. 272, 75 N. E. 268; *White* v. *St. Louis etc. Ry. Co.,* 44 Mo. App. 540; *Zumault* v. *K. C. & I. Air Line,* 71 Mo. App. 670; *Kunz* v. *Oregon R. & N. Co.,* 51 Or. 191, 93 Pac. 141. On the part of the respondents it is insisted (a) that the ordinance was considered by this court as an essential feature of the case upon the last appeal, and, the facts relating to the physical situation in the Billings yards being substantially the same at both trials, the court is precluded by the law of the case from giving consideration to the appellants' objection to the ordinance on this appeal; (b) that there is no pleading on the part of the defendants which will warrant them in raising the question presented. We are of opinion that this latter position is well taken, and it will not, therefore, be necessary to consider the respondents' first contention.

It is alleged in the complaint that on the date of the accident there was "in force in the city of Billings" the ordinance in question, which had been duly enacted. This allegation is met by a general denial on the part of the appellants. It is asserted by counsel that their denial that the ordinance was "in force" gives the right to contend that it is unreasonable and void as applied to this particular portion of the city's area. We are unable to agree with them in this. To us it seems clear that the denial in the answer simply raises the question as to whether any such ordinance as that referred to in the complaint was in

existence at the date in question. The ordinance did in fact exist; it was offered in evidence. If for any reason the defendants desired to take the position that, on account of peculiar physical conditions, it ought not to be considered as in force and effect in a particular portion of the city, to-wit, that part of the Billings yards wherein it was claimed to have been violated, they should have set 'forth the facts upon which their claim of an exception from the operation of the ordinance was based. (See *Kunz* v. *Oregon R. & N. Co., supra.*)

It is urged by appellants' counsel in their reply brief that as the evidence offered by them relating to the nature of the country to which the ordinance *prima facie* applied was admitted without objection, while they objected to the ordinance, the court's charge thereon, and the refusal of their offered instructions as to the same, a theory of the case was thus established in the court below which may not be departed from in this court, and, as the case was tried as if the issue was made, it is now too late to urge the contrary (citing *Capital Lumber Co.* v. *Barth,* 33 Mont. 94, 81 Pac. 994). We, however, are unable to determine that any such theory was adopted in the district court. It is true that the testimony referred to was received without objection, but the purpose of offering it was not explained at the time, and apparently it was material and competent as bearing upon other issues in the case. The ordinance itself was offered generally, and the court gave no reason for its ruling on appellants' objection. For aught we know, the point now raised by the respondents may have been the basis of that ruling.

2. Defendants, at the trial, after all of the evidence had been submitted, moved the court for an order directing a verdict in their favor. The motion was properly denied. The testimony at the second trial was substantially the same as at the first. This court held that the case should be submitted to the jury, and the trial court properly followed that direction. Under these circumstances the former decision established the law of the case. (*International Boom Co.* v. *Rainy Lake River Boom Co.,* 104 Minn. 152, 116 N. W. 221; *O'Neill* v. *Northern*

*Assur. Co.,* 155 Mich. 564, 119 N. W. 911; *Easterly* v. *Jackson,* 36 Mont. 205, 92 Pac. 480.)

3. The complaint is peculiar in its averments. It alleges that "the said defendants then and there unlawfully and grossly negligently and wantonly omitted to give any signal by bell or whistle," and "ran and drove the said train at a rate of speed grossly negligently and wantonly high," and "unlawfully, wantonly and grossly carelessly and negligently drove and ran said locomotive and train upon and over the said Neary." The court, at the request of the plaintiffs, gave certain instructions to the jury, in no one of which was any reference made to the necessity of proving that the negligence of defendants must have been of the quality designated as "grossly wantonly," etc. These instructions furnished the jury direct authority to return a verdict in favor of the plaintiffs even though they believed the defendants guilty of simple, or ordinary, negligence only. The defendants requested the court to charge, in effect, that, unless the jury found them guilty of gross and wanton negligence and recklessness, the plaintiffs could not recover. This the court refused to do. Error is assigned upon the ruling. This court in the case of *Robinson* v. *Helena L. & Ry. Co.,* 38 Mont. 222, 99 Pac. 837, said: "The rule contended for by counsel, that where the allegation is of willful or wanton wrong, proof of simple negligence will not justify a recovery, is, we think, founded upon correct reason, and is supported by the great weight of authority." It is claimed that this case falls within the rule there laid down. But there is something more in the complaint than a single allegation of reckless and wanton conduct on the part of the defendants. It may, perhaps, be admitted, as suggested by counsel for respondents, that in a case where no recovery could be had except by showing a willful wrong or such wantonness as would require or justify the inference of a purpose to injure, a recovery could not be had upon an averment of simple negligence; and, on the contrary, that if the complaint charged a willful and deliberate purpose to inflict a wrong, without any allegation that the injury was occa-

sioned by careless inadvertence, a variance would exist if the proof showed the injury to have resulted solely from simple negligence. The allegation here is that the defendants acted "unlawfully, wantonly and grossly carelessly and negligently." The word "unlawfully" undoubtedly refers to the alleged violation of the city ordinance. A willful act involves no negligence. It is a contradiction in terms to say that an act was done "willfully and negligently." The distinction was pointed out not only in the *Robinson Case,* but in the case of *Howie* v. *California Brewery Co.,* 35 Mont. 264, 88 Pac. 1007, as well. The adverbs employed in this pleading were so arranged as to make it difficult to determine whether they were intended to qualify the verbs "drove" and "ran," or to qualify each. If we omit the first four found in the last allegation quoted above, we have left the averment that the defendants "negligently drove and ran said locomotive engine and train upon and over said Neary."

In the case of *Turtenwald* v. *Wisconsin Lakes Ice etc. Co.,* 121 Wis. 65, 98 N. W. 948, called to our attention by appellants' counsel, the court said: "It would be far safer, in drafting a complaint in an action like this, to appreciate that a claim for an injury *wantonly* inflicted is one thing, and one for injury attributable to mere actionable negligence is a far different thing; and if it is desired to state a cause of action of the latter character, the pleader should omit all such words as 'willful, reckless and malicious' as regards the conduct of the defendant." We consider this sound advice. In that case the complaint charged that the servant of the defendant acted "carelessly, recklessly, negligently, willfully and maliciously." The court also said: "The complaint admits of a construction charging defendant with being guilty of a greater wrong than mere failure to exercise ordinary care. However, on the whole, it seems the parties on both sides, notwithstanding the peculiar language of the complaint, treated the action in the court below and in this court as one to recover compensation for damages attributable to ordinary negligence. In that situation it seems we are war-

ranted in treating the case in the same way, notwithstanding the charge of negligence is coupled with charges of reckless, willful and malicious conduct.'' And so in this case, the charge of negligence is coupled with a charge of wanton conduct, or perhaps it was intended to charge ''wanton negligence.'' We are satisfied that under a charge of gross negligence a recovery may be had upon proof of ordinary negligence. (*Richter* v. *Harper,* 95 Mich. 221, 54 N. W. 768; *Keating* v. *Detroit etc. R. Co.,* 104 Mich. 418, 62 N. W. 575; *Hays* v. *Gainesville etc. Ry. Co.,* 70 Tex. 602, 8 Am. St. Rep. 624, 8 S. W. 491; *Faulkner* v. *Kean* (Ky.), 32 S. W. 265; *Pendly* v. *Illinois C. R: R. Co.* (Ky.), 92 S. W. 1.) The word ''gross'' would simply be treated as surplusage. The case is simplified by the fact that the pleader omitted to use the word ''willfully.'' ''Wantonly,'' as here employed, falls short of meaning intentionally. It means ''recklessly'' or ''heedlessly.'' We are of opinion that all of these adverbs may be regarded as intended simply to convey the idea that the defendants were guilty of an extraordinary degree of negligence, if they qualify ''negligently,'' the last one used, at all, which may be doubtful. If we are correct in this conclusion, they may all be treated as surplusage, under the rule laid down in *Donovan* v. *McDevitt,* 36 Mont. 61, 92 Pac. 49; *Raymond* v. *Blancgrass,* 36 Mont. 449, 93 Pac. 648, 15 L. R. A., n. s., 976; *First National Bank of Portland* v. *Carroll,* 35 Mont. 302, 88 Pac. 1012; *Hoskins* v. *Northern Pacific Ry. Co.,* 39 Mont. 394, 102 Pac. 988; *Cassidy* v. *Slemons & Booth, ante,* p. 426, 109 Pac. 976. It may also be observed, in this connection, that the facts showing the relative situations of the defendant Frost, and the deceased Neary, at and before the time of the accident, the condition of the railroad yards, the relation which Neary bore to the Northern Pacific Railway Company, and the circumstances under which he was killed, are fully set forth in the complaint, in addition to those allegations, heretofore quoted, wherein the pleader attempted to characterize the acts of the defendants.

But it is said in appellants' reply brief (relying upon sections 5253, 5295, 5300, 5306, 5331, 5354, and 5355, Revised Codes, and

the cases of *Prosser* v. *Montana Central Ry. Co.,* 17 Mont. 372, 43 Pac. 81, 30 L. R. A. 814, and *Nelson* v. *Great Northern Ry. Co.,* 28 Mont. 297, 72 Pac. 642), that a distinction between degrees of negligence is recognized in this state. Even so, we are of opinion that, under an allegation of gross negligence, any lesser degree of negligence may be relied upon for recovery.

4. The court gave the following instructions to the jury:

"No. 7. As a general rule contributory negligence on the part of the deceased is fatal to a right of recovery in actions such as this. But it is not an invariable rule that, where one through his own negligence puts himself into a place of danger, a right of recovery is denied to him or to his heirs or representatives in case of his death because of injuries inflicted by another. The general rule that one's own negligence in such case precludes a recovery is subject to the qualification that where the defendant has discovered or should have discovered the peril of the position of the one killed, and it is apparent that he cannot escape therefrom or for any reason does not make an effort to do so, the duty becomes imperative for the defendant to use all reasonable care to avoid the injury; and if this is not done, he becomes liable, notwithstanding the negligence of the injured party or deceased. And this is true not only as to the trespassers upon a railway track in the way of passing trains, but also as to employees who may become so absorbed in their duties that they do not observe the signals. In no case may the railway company, after the peril becomes apparent to those in charge of a train, and especially so after it is obvious that the danger is not appreciated by the person in the perilous situation, omit any reasonable effort to stop the train and prevent injury.

"No. 8. Accordingly, if you find that the defendant Frost saw the deceased upon the track, and saw that for any reason he was not making an effort to leave it after the usual warning of the approach of the train had been given by blowing the whistles, and he could by the exercise of all reasonable care, after he recognized or ought in the exercise of reasonable care to have recognized that the deceased was apparently oblivious

of his danger, have stopped the train in time to have avoided striking him, the negligence of the deceased in going upon the track or in not leaving it after being warned, will not prevent a recovery in this case.''

"No. 10. It was the duty of the engineer if he saw the deceased on the track to give the usual warning signals, at such a distance as that if they should not be heeded there would remain time, considering the speed at which the train was going, to stop it before striking the deceased. If, accordingly, you find that after discovering that the deceased did not heed the signals given the defendant, Frost was not able with the means at his command to stop the train in time to avoid the casualty, you will consider whether he ought not in the exercise of reasonable care to have given the signals earlier, and if he ought to have done so, and had he done so, he would have been able to make a timely stop, the defense of contributory negligence is not available to defendants, and your verdict should be returned accordingly.''

Instruction No. 7 was objected to by the defendants on the ground that it submitted to the jury "an alleged duty in the respect that the engineer or defendant should have discovered the peril of the position of deceased without regard to actual discovery, whereas the doctrine of last clear chance only begins upon the actual discovery of the perilous position of deceased.'' No. 8 was objected to for the same reason, and for the additional reason that "it ignores the doctrine of preponderance of the evidence and permits the jury to make findings from this source.'' No. 10 was objected to "for the reason that it deals peculiarly with the question of primary negligence in not sounding and signaling, and in not sooner discovering the deceased, and also because it ignores the doctrine of contributory negligence, and also because it permits the jury to make their findings from any source. Also, because it would wipe out any possible defense under the doctrine of the last clear chance, by demanding an action of the engineer that would have been impossible confessedly under the instructions upon the conditions assumed.''

The court modified the following instruction tendered by the defendants: "This doctrine of the last clear chance may be stated as follows: The general rule that where one, who through his own fault puts himself in a place of danger on a railroad track, is precluded from recovering damages for his resultant injury or death, is subject to the qualifications that where the engineer has discovered the peril of the deceased or his position, and it is apparent that he cannot escape, or he, for any reason, does not make an effort to do so, it becomes the duty of the engineer to use all means in his power to avoid injuring the person," by inserting, after the word "has" the following: "or by the exercise of ordinary care should have discovered."

The court refused to give the following instruction offered by the defendants: "No. 8. I instruct you that in considering whether engineer Frost acted with wanton and reckless negligence after discovering the peril of the deceased, in not avoiding striking him, you must take the situation and condition then existing, just as it was, not as you think it ought to have been. In other words, in the matter of speed, you cannot say that engineer Frost wantonly and recklessly ran down the deceased because you may be of opinion that if his train had been run at a different and lesser speed, whether within the ordinance requirements or otherwise, it would have been possible to have avoided striking him. This would be holding the defendant responsible for a previous act of negligence in the matter of speed; but the essential feature of the doctrine of last clear chance is that the conduct of the person whose action is the subject of inquiry must be tested by what he might have done under the conditions, as to speed and otherwise, as they actually then existed. So that your inquiry will be, with the speed of the train as it was, could engineer Frost, after discovering the peril of the deceased, and that deceased was unaware of his danger, and did not intend to withdraw to a place of safety, with such appliances as he then had, in the condition in which they were, have stopped the train in time to have avoided striking the deceased, and was his failure to do so, if you find there was such

a failure, the result of recklessness and wanton indifference to human life, or merely the result of the exercise of bad judgment under the conditions then existing?"

It is contended that Neary was not entitled to have an active lookout kept for his presence upon the tracks, because he is to be regarded as a bare licensee (citing *Egan* v. *Montana Central Ry. Co.,* 24 Mont. 569, 63 Pac. 831.) It is alleged in the complaint that the employees of the Chicago, Burlington & Quincy Railway Company used the tracks and switches of the Northern Pacific Railway Company in making up trains and in operating the same, by permission of, and agreement with, the defendant company, and that the company and its employees had full knowledge and notice of this fact. Defendants maintain that there is no proof of this allegation. To this we cannot agree. There is testimony in the record to show that for eight or more months prior to the death of Neary, Chicago, Burlington & Quincy trains had been running into the Billings yards of the Northern Pacific; that these trains would "go any place in the yards west of the depot"; Chicago, Burlington & Quincy trains and crews used the Northern Pacific tracks as far as Huntley, about twelve or fourteen miles east; they would use any of the yard tracks that happened to be open, always, however, using tracks to the right (north) of the main track, taking "as much room" as they needed to make up the trains; the yard switch crew would break up Chicago, Burlington & Quincy trains, and, in making up such trains, any track was used which happened to be clear; in running into the yards these crews were directed by the yardmaster where to go; train No. 6, through the operation of which Neary was killed, ran out of Billings east, as Chicago, Burlington & Quincy No. 42, on a regular schedule; Chicago, Burlington & Quincy conductors, including Neary, were furnished with a copy of that schedule or time card; Northern Pacific cars ran over the Chicago, Burlington & Quincy to Kansas City as a part of the Chicago, Burlington & Quincy trains; the Chicago, Burlington & Quincy train crews used the Northern Pacific book of rules while on the Northern Pacific tracks;

Chicago, Burlington & Quincy employees were obliged to pass an examination on the Northern Pacific book of rules; Northern Pacific car inspectors inspected Burlington freight trains in the Northern Pacific yards. We think this testimony furnishes ample indirect evidence to substantiate the allegation of the complaint. If we are correct in this, the case probably falls within the rule laid down in *Riley* v. *Northern Pacific Ry. Co.,* 36 Mont. 545, 93 Pac. 948. The writer of this opinion is not in sympathy with the rule laid down in the *Egan Case, supra,* as applied to the facts in that case. But let us proceed to a consideration of the instructions in the light of the facts of this particular case.

With regard to instruction No. 7 it may be said that it is almost a literal copy of the language used by this court in deciding the former appeal, and is, therefore, right or wrong, the law of the case. But, it is argued, the court was merely announcing a general doctrine, and is not, therefore, foreclosed of the opportunity of now deciding that, in this particular case, the trial court was in error in supplementing the rule of the last clear chance, with the so-called "discovery doctrine." It is contended that the question is still an open one in this jurisdiction, and that the logical rule, and the one sustained by the great weight of authority, is that the doctrine of the last clear chance of averting the accident, in a case like the one under consideration, should be limited to the possibility of so doing after actual discovery, as distinguished from possibility of discovery. If in this statement the learned counsel for the appellants refer to the actual discovery of the presence of the person who is killed or injured, and that in a place where no duty rested upon the defendants to look out for him, the question must still remain an open one, because it is not presented by this record. Each of the instructions criticised refers to the possibility of discovering, by the exercise of reasonable care, the peril of the deceased, not alone his presence upon the track. His presence was discovered when the engine was 900 feet way. Instruction No. 8, wherein the court applied the abstract principles laid down in

No. 7 to the facts of this particular case, is distinctly predicated upon an initial finding by the jury that Frost saw the deceased upon the track, and also saw that he was not making any effort to leave it after being warned. Frost himself testified that when he crossed the western line of the Billings yards, he was going at the rate of from forty-five to fifty miles per hour. Some time after entering the yards, and about 1,900 feet west of where Neary was struck, he made a service application of air of about five pounds pressure. There is a public road crossing 7,040 feet west of the depot. At this point Frost sounded the usual crossing whistle. He said: "This [service] application was continued just after giving the first road-crossing whistle, when I was giving the second whistle for the man to get off the track, and repeated the whistle to find out whether he heeded the whistle or not, or heard the whistle. Had traveled with this five pounds application possibly a thousand feet and got within 900 feet of where he was, I should judge. Just about saw him for the first time when I got within 900 feet of him. I then gave two long and two short blasts or whistles, applied the air at the same time, the full service application of about fifteen pounds. There hadn't been any releasing at all of the five-pound application. The full application continued until I saw the man leave the track from within the rails and walk to the right. I then made a full-service release. In going this distance of a thousand feet with the five-pound application, the speed was reduced ten or twelve miles an hour, say about thirty-two or thirty-three miles an hour. I was within 400 feet of him when I made the release of the air. Then ran without any application of the air at all, before I applied the emergency, possibly 175 feet. I released the air because I saw him step outside the track. I was not in doubt from his movements as to whether he had heard me at all or not. I supposed he would get out of the way or was out of the way. From what I could see I thought he was at least three or four feet from the outside of the track. I had noticed he was taking check of his train. Afterward he stepped a little to the left.

He was walking all the time. Didn't appear to stop any more than to take a number and go on. I saw him up to the time I struck him. He was outside of the rail when I struck him. I ran, after applying the emergency, I should judge, 225 feet, before I struck him. At the time I struck him was running about twenty-five miles an hour. At the coroner's inquest I testified: 'When I first saw the man he was walking to the middle of the track, and just before I hit him, he stepped off to the right toward the outside of the track, and I looked for him to go off the track and as I approached nearer, I saw that he just stepped that way, simply because it happened to be that way.' ''

J. H. Manley, a witness to the accident, testified: "I should judge the train ran about 150 yards beyond where the man was struck. He was standing just about on to the right—over the south rail."

C. C. Bever, a passenger on the train, testified that he felt no sudden jar in the stopping of the train.

There was testimony to show that a passenger train going at the rate of twenty-five or thirty miles per hour could, with an emergency application of air, be stopped in from 250 to 300 feet, and going at the rate of six miles per hour, it could be stopped in from two to fifteen feet. There was also testimony to show that the jar caused by an emergency stop would be felt by the passengers in the train.

Barrell, the fireman, testified: "Frost released the air after Neary had stepped to the outside of the rails. After hearing this whistle or after making this whistle, and then as he saw he didn't get in the clear—he whistled a succession of short whistles and held his engine in the emergency."

Gintz, one of the brakemen on Neary's train, testified that he was in the caboose when No. 6 passed; when the engine passed, the whistle was sounded in an unusual way—like a roar going by. The caboose was about 600 feet west of where Neary was struck. There were nine cars in the passenger train. The body lay opposite one of the Pullman sleepers which was either the eighth or ninth car from the engine. The length of these cars

and the engine was such that the engine must have passed the spot where deceased was struck, at least 150 yards before it was brought to a standstill.

Defendants' witnesses testified that Neary paid no attention to the approach of No. 6. He would take check of a car and then pass along to the next, walking between the rails of the main line in an irregular manner, apparently absorbed in his work. One of the car-repairers in the yard noticed the effect of the application of the emergency brake by Frost. The alarm whistle sounded by the engineer was heard and recognized as such by citizens a block or more from the railway yards. Frost also testified at the coroner's inquest: "From the time I first saw the man I would not dynamite the train the first time I saw him. You would think to whistle, giving alarm signals he would get off the track, and if you dynamite the train every time you saw anyone on the track or everything you saw on the road, you would be pretty slow on the trip."

In view of all of this testimony, the jury might have been justified in finding that Frost used ordinary care to determine whether or not Neary was in peril, and that he employed every reasonable effort to stop after he discovered his perilous situation. He says he apparently heeded the signals by stepping off to the south, but did not go far enough to become "in the clear." As was said in the former opinion in this case, no duty rests upon an engineer to stop his train whenever he sees a person upon the track, regardless of the distance away at which such person may be. He has the right to presume in the first instance that such person will heed the usual warning signals and take a place of safety. But whether, in view of all the facts and circumstances disclosed by the evidence, Frost was justified in acting upon this presumption to the extent that he did, was essentially a question of fact for the jury; and those instructions which imposed upon him the duty of using reason- able care to discover Neary's peril were, we think, in the circum- stances of this case, appropriate and proper. Frost saw the necessity of sounding alarm signals when he was 600 feet from

the place of collision, and although he could have stopped his train in a distance of 300 feet, he in fact ran over 450 feet after the moment when, according to his testimony, he made the emergency application of his breaking apparatus.

The supreme court of Colorado, in *Nichols* v. *Chicago, B. & Q. R. Co.*, 44 Colo. 501, 515, 98 Pac. 808, 814 said: "Ordinarily, an engineer may presume that one approaching a public crossing over which a train is about to pass is aware of the approaching train, or will not place himself in a position of imminent peril; but he is not justified in relying upon this presumption if the circumstances are such that, as a reasonably prudent person, it should occur to him that the pedestrian is not aware that a train is approaching the crossing over which he is about to pass. An engineer guilty of negligence cannot blindly assume that a traveler approaching a crossing will not be. Ordinary care on the part of an engineer requires vigilance to guard against a dangerous situation reasonably to be apprehended as well as one actually imminent."

The jury would have been justified, we think, in concluding that Neary's absorption in his duties and his total failure to heed the approach of the train, with all danger signals sounding, was so apparent as to throw discredit upon the engineer's story of his own situation and actions at the time, and to lead to the conclusion that he exercised no care at all until a moment when no effort on his part could avert the accident.

Again, it is urged that because the complaint alleges that the engineer saw Neary when the train entered the yards and was aware that he was unconscious of its approach and knew of the danger he was in "a long distance before reaching him," a theory of the case was thus developed by the pleader which could not thereafter be departed from by claiming at the trial that, in the exercise of reasonable care, the perilous position of the deceased should have been discovered. Considering Frost's testimony as to how the situation presented itself to him, and all the other facts and circumstances in the case, we think the variance, if any, between the allegations of the complaint and the

theory upon which recovery was eventually sought, was immaterial.

5. Regarding those instructions wherein the jury were told that they might take into consideration the fact that the train was running at a rate of speed in excess of that prescribed by the city ordinance. It is contended that this excess speed was prior or primary negligence on the part of the defendants, which was offset or nullified by Neary's contributory negligence, and as the same speed was maintained up to the time of the collision, 'it was not an element to be considered by the jury in arriving at a verdict. There is no question, under the testimony, that the usual signals of the approach of the train were given by whistle. Whether the bell was ringing may be a matter of doubt, but, if it had been, it would probably have added nothing to the vociferous whistle alarm. The primary negligence of the defendants must have been in the excessive rate of speed; otherwise the negligence of Neary would not have been contributory. That it was contributory is settled by the law of the case. Three times, in the former opinion, this court spoke of the excessive speed of the train. The last reference is as follows: "We do wish to be understood, however, as holding that the defendants were guilty of gross negligence in running the train as they did, in violation of the ordinance; and that, taking into consideration this fact, together with the other facts admitted to be established by the evidence, it was not the province of the court to determine as a matter of law whether the defendants by the exercise of reasonable care could have stopped it and saved the deceased's life. This phase of the case should have been submitted to the jury under proper instructions." We do not see how the trial court, in the light of this language, could have refused to submit the matter for the jury's consideration, upon proper request being made. The direction· therein contained established the law of the case. But we are not content to rest our conclusion upon this consideration alone. It is impossible to disabuse one's mind of the idea that the excessive rate of speed at which the train was.

being propelled, after the engineer decided that extraordinary danger signals were necessary, was a proximate cause, if not *the* proximate cause, of his failure to avoid killing the deceased. To hold him excused for running at this high and dangerous rate of speed, after he discovered that Neary had placed himself in the most exposed position which could be selected, on account of the fact that he was violating the city ordinance and the rules of the company before he discovered the situation of the deceased, would seem like allowing him to take advantage of his own wrong. According to some of the witnesses, if the engineer had been observing the ordinance he could have stopped instantly. They all agree that he could have stopped within a few feet. We know that the momentum of the train and the force of the impact against Neary's body would, under such circumstances, have been comparatively insignificant. Probably he would have been but slightly injured, if injured at all, had the train been under full control as prescribed by the rules of the defendant company.

Counsel for appellants have called the case of *Sullivan* v. *Missouri Pac. Ry. Co.,* 117 Mo. 214, 23 S. W. 149, to our attention on this point. In that case the jury were instructed as follows: "And in this regard the court further instructs you that although you believe from the evidence that Ellen Sullivan was guilty of negligence in stepping upon the track, and although you may believe from the evidence that the servants, agents and employees of defendant in charge of said train, after seeing her on the track, and discovering the danger of her position, if it was dangerous, could not have avoided injuring her by the use of ordinary care; yet if you further find and believe from the evidence that their inability to avoid such injury after discovering her condition was caused by their running at an illegal rate of speed, and if they had then and there been running at a legal rate of speed they could have avoided injuring her, by the use of ordinary care, then such negligence of said Ellen Sullivan is no defense to this action." The supreme court of Missouri said: "The first time the doctrine contained in this

qualifying clause came before this court in such a tangible shape as to warrant a ruling upon it was in the case of *Guenther* v. *Railway Co.*, 95 Mo. 286, 8 S. W. 371, in which it was disapproved. The next was in *Kellny* v. *Railway Co.*, 101 Mo. 67, 13 S. W. 806, 8 L. R. A. 783, and the last in *Dlauhi* v. *Railway Co.*, 105 Mo. 645, 16 S. W. 281, in both of which it was also disapproved. The reasoning in these cases shows that to adopt it would be, in this class of cases, to practically abrogate the doctrine of contributory negligence; for, while the principle which lay at the root of the accepted doctrine was that, although the plaintiff was guilty of negligence, contributing with that of the defendant to the production of the injury, yet if the defendant could, by the exercise of due care, after the situation became or might have become apparent to him, have prevented the injury, he was held responsible. The principle of this new doctrine is that he is to be responsible, whether he could have prevented the injury or not, after the situation became or might have become apparent to him. In applying this new doctrine to the acts of negligence, provided they further found facts in this case, the jury may well have concluded from this instruction that, although they might find that the deceased was guilty of gross negligence in entering upon the track in front of the approaching train, yet, if they further found that if the train was being run at a greater rate of speed than six miles an hour, they ought to find for the plaintiff, though the death of his mother was the result of these two concurring acts of negligence, provided they further found the fact to be that she went upon the track at any distance from the train within which it could have been stopped before it struck her, if the train had been going at no greater rate of speed than six miles an hour. Thus, the power to prevent the injury is practically eliminated by the instruction from the law of contributory negligence as a basis of recovery; and the right to recover is predicated upon concurrent negligence of both parties, and the finding of a fact tending only to prove that the deceased was not negligent. It is to be regretted that in so close a case as this,

otherwise so well tried, an error such as this should have been committed; but the error being of such character as that it may have affected the result, the judgment must be reversed, and the cause remanded for a new trial.''

At first impression the rule laid down in the foregoing opinion appears to be logical; but after mature consideration we have arrived at the conclusion that it is not founded upon correct. reasoning; and it is certainly not a humane rule. Several of the judges dissented vigorously from the conclusion reached in the *Sullivan Case* on the question we are considering. The contributory negligence of a plaintiff or deceased person which will operate to defeat a recovery must be such as directly contributes to the injury at the time it is inflicted; his negligence must be a proximate cause of his injury. Running a train in a city in excess of the rate of speed fixed by ordinance is negligence *per se;* and if this lapse of duty directly contributes to an injury the person responsible therefor is liable in damages. (*Monson* v. *La France Copper Co.,* 39 Mont. 50, 133 Am. St. Rep. 549, 101 Pac. 243; *Osterholm* v. *Boston & Mont. C. C. & S. Min. Co.,* 40 Mont. 508, 107 Pac. 499, 505.) How, then, can it be said that the excessive rate of speed after Neary's peril was discovered was but a continuance of that primary negligence which obtained before such discovery? It existed as an active agency up to the very moment of collision, and may be said to have been a new and different act of negligence. It contributed directly to his death. Indeed, had it not been for the fact that the ordinance was being violated, the death of Neary, viewing the attendant circumstances from Frost's standpoint, could have been avoided, in all probability. If the excessive rate of speed before discovery constitutes negligence *per se,* and circumstances intervene, to-wit, discovery of position or peril, which make it incumbent upon an engineer to use every reasonable effort to avoid striking a man upon the track, and he is unable to stop solely on account of the excessive speed which was maintained, not only before, but after discovery, we are satisfied that the fact that the ordinance was being violated is *per se* evidence

of negligence after discovery, as well as at any other time to which inquiry may properly be directed; and that the only defense under the circumstances, assuming the excessive and illegal rate of speed to be admitted or proven, is that such violation of the ordinance was not the proximate cause of the accident. In this case, Neary's negligence contributory to the primary fault of Frost was not the proximate cause of his death. It was a mere condition existing prior to the accident. The proximate cause was the fact that Frost was unable to stop his train because of the further fact that he was violating the city ordinance and the rules of the company after Neary's peril was discovered by him. We have no hesitancy in saying that if a railway engineer approaches the yards of his company at Billings, or any other city where a similar ordinance is in force, at a rate of speed exceeding six miles per hour and observes a person in the yards upon the track over which he is about to pass, the duty of reducing his speed to the ordinance limit arises instantly upon entering the city limits, and that the engineer, under such circumstances, may not rely upon the usual presumption that the person will, upon signal, assume a place of safety.

6. It is contended that the verdict is so large that, in view of the testimony, it evidences passion and prejudice in the minds of the jury and a new trial should have been granted for that reason. The verdict is very large. However, there is substantial evidence to warrant it. W. P. Matheson, a life insurance agent, testified that according to standard mortality tables, Neary's expectancy of life was about twenty-nine years, and that an annuity of $100 per year would have cost him about $1,800; that the insurance companies, or compilers of the annuity tables, base their calculations on the earning power of money at three per cent per annum. He also said: "I know of farm loan mortgages being made in this neighborhood at rates of interest of seven to ten per cent, an average of eight per cent, without taxes to nonresidents. I have never known of any loss around here on such security. The charge made for annuities is large enough to pay the proportionate share of running ex-

penses and the profit of the company. The only advantage of an annuity over an investment in farm loans would be the increased security.'' Mrs. Neary testified that her husband's wages averaged $150 per month the year around. The amount of his personal expenses does not appear, but we may adopt the suggestion of counsel for both sides, that $50 per month would be a fair allowance.

The court instructed the jury that in considering the annuity tables, in determining the amount of damages to be awarded, they should take into consideration the maximum safe earning power of money in the community. They may have determined this to be three per cent. Under the evidence they were warranted in so doing. At this rate an annuity yielding $1,200 per annum would cost $21,600, or $3,400 less than the amount of the verdict. The testimony shows that Neary was an excellent husband and father, a man of some education, given to reading and study, and capable of instructing his children. He spent his evenings at home, was strong, healthy, industrious, and of a happy and agreeable disposition. We cannot say that $3,400, or twice that amount, would be an excessive allowance for loss of his society, companionship, care, and protection. In the nature of things, jurors must be left to judge such matters for themselves. We repeat that this verdict is very large—larger perhaps than any verdict which has ever been rendered in the courts of this state under similar circumstances; but in so far as it comprehends loss of that portion of earnings which would probably have been contributed to the support and maintenance of the plaintiffs, the great part of it is capable of being arrived at by mathematical calculation under the testimony. No argument is advanced in criticism of the instructions. This court in *Yergy* v. *Helena L. & Ry. Co.*, 39 Mont. 213, 242, 102 Pac. 310, 320, said: ''The elements of passion and prejudice will not be presumed to have influenced the minds of jurors who return a verdict, based on competent testimony, in accordance with instructions, and easily to be arrived at by mathematical calculation.'' The fact that the jury selected as the basis of

their verdict the evidence which would result in a large award of damages cannot be said to evince passion or prejudice on their part.   Their power of judging of the effect of evidence necessarily involved a right to act upon any competent evidence.

7. Appellants objected to certain items of costs and disbursements for mileage and *per diem* included in respondent's memorandum of costs as filed in the district court and moved to retax the same.   We will take the case of the witness Gintz as a sample of the items to which objections were filed.   The memorandum reads: "L. Gintz, from state line and return, first and second trials, 460 miles, $46.00."   The ground of objection is thus stated in the brief: "The chief point of our objection is that, as the statutes (sections 3182 and 7169, Revised Codes) contemplate that a witness shall be allowed the mileage necessarily traveled by the shortest traveled route in coming from the place of his residence to the place of trial, and returning from the place of trial to his residence, it is necessary, when such mileage is claimed, that the cost memorandum should advise the party against whom it is sought to charge the mileage, as to where the place of residence of the witness is, to the end that it may be determined therefrom whether that is in fact his residence, and whether the mileage claimed is actually the mileage by the shortest traveled route between the two places; and the memorandum should further state that this number of miles was necessarily traveled."   The cases of *Cole* v. *Ducheneau,* 13 Utah, 42, 44 Pac. 92, *Garr* v. *Cranney,* 25 Utah, 193, 70 Pac. 853, and *Merriman* v. *Bowen,* 35 Minn. 297, 28 N. W. 821, are cited to support the argument.   To relieve the controversy of the question of indefiniteness as to dates of attendance of witnesses and mileage necessarily traveled, an amended memorandum was prepared, accompanied by a motion for leave to file the same. Service of the amended memorandum and of the motion for leave to file was made upon the appellants.   The court refused to allow the amended memorandum to be filed and overruled the objections to the original memorandum.   We think the motion for leave to file the amended memorandum should have been

granted. The taxation of costs is such a "proceeding" as is referred to in section 6589, Revised Codes, giving the court authority to allow an amendment thereto "in other particulars." No new items were sought to be added to the original bill. The plaintiffs simply furnished therein the particular information, the absence of which from the original memorandum was alleged by the defendants to be prejudicial to their rights. The supreme court of Utah has made a similar ruling (*Dignan* v. *Nelson*, 26 Utah, 186, 72 Pac. 936), as has also the supreme court of California, in *Burnham* v. *Hays*, 3 Cal. 115, 58 Am. Dec. 389. We think the holding is in accordance with the spirit of our statute relating to amendments and the intention of the legislature in enacting the same. Neither is it necessary to make a showing of inadvertence, surprise, or excusable neglect in order to warrant the court in allowing such an amendment.

It is contended by the appellants that for this court to now consider the amended memorandum would deprive them of a right to attack the items of mileage by a countershowing after they had been properly identified; while on the part of the respondents it is contended that if we should now sustain the appellants' objections to the original memorandum, their right of appeal from the order refusing to allow the amendment is lost to them, inasmuch as they had a ruling in their favor as to the sufficiency of the original memorandum, and could, therefore, not appeal. But we do not attach importance to either of these considerations in the circumstances. Our judgment is that the district court abused its discretion in refusing leave to file the amended memorandum. Upon the motion for leave to file being made, the court should have granted it despite objection. The appellants might then have met the same in any manner that seemed advisable. We think it our duty to consider it as filed, and to overrule the objections to the items of costs and disbursements, for that reason.

The judgment and order appealed from are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.